NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| _____ ) | Hon. Harold A. Ackerman |
| IN RE: JACOBY AIRPLANE CRASH ) | |
| LITIGATION ) | Civ. No. 99-6073 (HAA) |
| ) | |
| ) | **OPINION & ORDER** |
| _____ ) | |

**ACKERMAN**, **Senior District Judge:**

This matter comes before the Court on several motions *in limine* (Docket Nos. 302, 308,

304) filed by Defendants S-TEC and the Government; a motion for summary judgment (Docket

No. 317) and a related motion for leave to file supplemental information (Docket No. 367)

regarding the motion for summary judgment by Defendant S-TEC; a motion to file a sur-reply

brief (Docket No. 352), and a motion for clarification (Docket No. 381) as to a prior ruling of this

Court by the Jacoby Plaintiffs.  For the following reasons, the motions *in limine* are granted in

part and denied in part, the motion for summary judgment is denied, the motion to file

supplemental information is granted, the motion to file a sur-reply is denied as moot, and the

motion for clarification is granted.

I.   **Background**

On November 26, 1999 at 10:49am, Itzhak Jacoby piloted a single-engine, propeller-driven airplane containing his wife Gail and their thirteen-year-old daughter Atira from the Linden airport.  The weather at that time consisted of light rain and mist, with two-and-a-half miles of visibility.

Upon take-off, air traffic control ("ATC") instructed Dr. Jacoby to maintain 5,000 feet, but a few seconds later revised the instruction for him to maintain 2,000 feet.[1]  Thirty-four seconds later, ATC instructed Dr. Jacoby to turn left to a heading of 270 degrees.  Dr. Jacoby did not immediately respond.  After two more attempts to communicate with Dr. Jacoby, he finally responded by saying "I have a problem."  He clarified that he had a "gyro problem momentarily," but indicated that it appeared to be corrected.  Dr. Jacoby speculated that he "must have had water in the system."

ATC then directed Dr. Jacoby to turn to a heading of 270 degrees and climb to and hold at 2,000 feet.  ATC had to reissue the instruction one or two more times, without response from Dr. Jacoby.  Finally, Dr. Jacoby responded again with "I have a problem," which turned out to be the last recorded transmission from Dr. Jacoby.  At some point in the exchange of transmissions, Dr. Jacoby requested from ATC to be granted a higher altitude clearance, but ATC denied that request.

In the last thirty seconds of radar data, the plane reached a maximum altitude of 2,800

---

[1] Itzhak Jacoby held Bachelors and Masters of Science degrees in engineering from the Israel Institute of Technology, as well as a Masters of Science and Ph.D. from Cornell University.  Therefore, the Court will refer to Itzhak Jacoby by his earned title of "Doctor," contrary to Defendants' usage of "Mister."

2

feet and 161 knots of airspeed, before beginning a final descent that reached approximately 10,000 feet-per-minute before damaging a chimney on a three-story building, crashing into another three-story building at the corner of Brenner and Kent Streets in Newark, and ultimately breaking apart and coming to a rest at the end of Kent Street.[2]  The total flight time lasted approximately 4-6 minutes.

The three plane occupants died at the scene.  Two individuals on the ground suffered serious injuries, with one dying approximately eight weeks after the accident.  An additional twenty-five people suffered minor injuries.  Approximately eighteen buildings were damaged in some manner, ranging from structural damage to broken windows.  Three of those buildings were condemned and subsequently demolished.  In addition, eight vehicles were damaged, some destroyed.

A toxicology report revealed that Dr. Jacoby had concentrations of a barbiturate known as butalbital in his urine, kidney and spleen; blood samples were not available for examination. Discovery revealed that Dr. Jacoby took Fiorinal, a prescription headache medication containing butalbital.  Dr. Jacoby was prescribed over 6,000 tablets of Fiornal between 1992 and October 1999, with approximately 800 tablets being dispensed in 1999 alone.  The most frequent adverse reactions to Fiornal are drowsiness and dizziness.  Dr. Jacoby stated on his Federal Aviation Administration ("FAA") application that he was not taking any medication, prescription or otherwise.  In addition, he did not indicate any suffering from severe or frequent headaches.

Dr. Jacoby's airplane contained three gyroscopically-driven instruments: the attitude

_____

[2] One knot per hour is approximately equal to 101.268591 feet per minute.  Therefore, Dr. Jacoby's descent of 10,000 feet-per-minute translates to a vertical speed of about 98.7 knots.

indicator, the horizontal situation indicator ("HSI") and the turn coordinator.  Defendant S-TEC manufactured the turn coordinator on Dr. Jacoby's plane.  The turn coordinator, one component of the autopilot system, provides information about the rate and direction of a turn.

Plaintiffs brought this action against S-TEC and the Government, claiming that the combination of a faulty turn indicator and denial of higher altitude clearance caused the plane to crash.  S-TEC now moves *in limine* to exclude an editorial authored by Jon L. Jordan, the Federal Air Surgeon from 1991 to 2006, which editorial referenced the Jacoby incident with negative implications for S-TEC's defense.  In addition, S-TEC and the Government have separately moved *in limine* to exclude three documents produced by the National Transportation Safety Board in relation to the Jacoby crash.  Specifically, the Government seeks to exclude a 2001 Safety Recommendation report as well as a Recorded Radar Study, whereas S-TEC seeks to exclude a Materials Laboratory Factual Report.  S-TEC has also moved for summary judgment as to Dr. Jacoby's estate on the grounds that Dr. Jacoby's claims are barred due to his repeated violations of public policy by way of his failure to report his medical condition and his use of Fiorinal.  The Jacoby Plaintiffs have moved to file a sur-reply brief regarding lost prospective inheritance, but because the Court ruled on that issue previously, and in Plaintiffs favor, Plaintiffs instant motion will be denied as moot.  Finally, Plaintiffs have filed a motion seeking clarification of this Court's prior ruling as to the scope of testimony of one of Plaintiffs experts William Jeffrey Edwards.  This Opinion & Order disposes of all outstanding motions in advance of the trial set to begin on September 25, 2007.

## II.    <u>Analysis</u>

The Court will apply the substantive law of New Jersey because the crash occurred in New Jersey and this case comes before the Court on a diversity basis, at least as to S-TEC.  With respect to the Government, the Federal Tort Claims Act (the "FTCA") provides a remedy against the United States for injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  Therefore, liability under the FTCA only arises if a private party would be liable to the plaintiff under the law of the state where the conduct actually occurred.  *Merklin v. United States*, 788 F.2d 172, 173 (3d Cir. 1986).  Thus, New Jersey law applies here, as to both S-TEC and the Government, because the airplane crash occurred in Newark, New Jersey.

As a general matter, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Evidence that is not relevant is not admissible.  Fed. R. Evid. 402.  Of course, even relevant evidence may be excluded if it is more prejudicial than probative.  Fed. R. Evid. 403.  Prejudicial means something more than merely harmful; it refers to the negative consequence of unfair prejudice.  *See Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 525 (3d Cir. 2003) ("[T]he . . . prejudice against which the law guards [is] . . . *unfair* prejudice . . . prejudice of the sort which cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as found . . . .  [P]rejudice does not simply mean damage to the opponent's cause.  If it did,

most relevant evidence would be deemed prejudicial.") (internal quotation marks omitted).

Questions of relevancy are committed to the discretion of the trial court. *Pfeiffer v. Marion Ctr. Area Sch. Dist.*, 917 F.2d 779, 781 (3d Cir. 1990); *see also Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 110 (3d Cir. 1999); *United States v. Donley*, 878 F.2d 735, 737 (3d Cir. 1985).

### A.    Docket No. 302 - Editorial of Federal Air Surgeon Jon Jordan

Dr. Jon L. Jordan, M.D., J.D., was the Federal Air Surgeon from 1991 to 2006.  A review of the FAA's organizational chart reveals that under the Deputy Administrator of the FAA is the Associate Administrator of Aviation Safety ("Aviation Safety").[3]  Under the umbrella of Aviation Safety are several offices, including the Office of Aerospace Medicine.[4]  The Federal Air Surgeon is the highest ranking official in the Office of Aerospace Medicine.  Importantly, the Office of Aerospace Medicine has within its purview the Civil Aerospace Medical Institute ("CAMI").  As discussed in a prior Opinion by this Court, the NTSB, which is statutorily required to investigate all aircraft accidents, contacted Dr. Dennis V. Canfield, director of the Forensic Toxicology and Accident Research Laboratory at CAMI, to request that a butalbital distribution study be performed.[5]  Thus, at least in a titular sense, Dr. Jordan as the Federal Air

---

[3] "Aviation Safety is an organization responsible for the certification, production approval, and continued airworthiness of aircraft; and certification of pilots, mechanics, and others in safety-related positions."  http://www.faa.gov/about/office_org/ headquarters_offices/avs.

[4] "The Office of Aerospace Medicine is responsible for a broad range of medical programs and services for both the domestic and international aviation communities." http://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam.

[5] NTSB investigators wanted to know how the level of butalbital found in Dr. Jacoby's muscle tissue corresponded to the concentration of the drug in his blood at the time of the

Surgeon was the ultimate boss of Dr. Canfield.  The importance of this fact will become more obvious later.

For present purposes, it is important to know that CAMI publishes the Federal Air Surgeon's Medical Bulletin ("FASMB") "quarterly for aviation medical examiners and others interested in aviation safety and aviation medicine.  The [FASMB] is prepared by [CAMI], with policy guidance and support from the Office of Aerospace Medicine." http://www.faa.gov/library/reports/medical/fasmb.  Within each edition of the FASMB, the Federal Air Surgeon publishes an "editorial."

In the Summer 2001 edition of the FASMB, Dr. Jordan, while still the Federal Air Surgeon, published an editorial entitled "Setting a Positive Example."  In that editorial, Dr. Jordan briefly discussed the facts of the Jacoby accident.  Dr. Jordan never mentioned Jacoby by name, but no party disputes that the facts contained in the editorial are a clear reference to the Jacoby incident.  For example, Dr. Jordan declared that he was "astounded by the findings in a recent airplane accident" because "postmortem toxicology studies revealed butalbital in the doctor's urine and body tissues," but the doctor's "FAA medical records revealed no entries regarding the use of medications or information on the presence of a medical condition."  (Jordan Editorial, Ex. 5; *also available at* http://www.faa.gov/library/reports/medical/fasmb/editorials_jj/positiveexample.)

Most notably, Dr. Jordan stated in his editorial that "the doctor's use of butalbital was probably not a major contributor to the accident."  (*Id*.)  Plaintiffs would like this statement by Dr. Jordan to become part of the evidence at trial.  In turn, S-TEC, by this motion, seeks to

accident.

exclude that evidence.  Importantly, the Government has neither moved to exclude Dr. Jordan's editorial, nor has it joined in S-TEC's motion.  Nevertheless, S-TEC briefly argues that the editorial is not admissible against the Government, despite S-TEC's lack of standing to make such an argument.  Additionally of note is the fact that Dr. Jordan signed an Affidavit on November 21, 2006, stating, in substance and in part, that the editorial in question "was not intended to express any opinion regarding the potential or probable cause(s) of the accident." (Jordan Aff. at ¶ 6.)

In its opening brief, S-TEC focuses most of its argument for exclusion on the business records and public records exceptions to the hearsay rule, contending that neither is a viable exception for admissibility as to Dr. Jordan's editorial.  Plaintiffs' response brief declares that S-TEC anticipated incorrectly because Plaintiffs intend that "the statement [will] be offered, but not as a business record or a public record."  (Pls.' Br. at 4.)  Instead, Plaintiffs assert that Dr. Jordan's editorial is admissible on two grounds: (1) admission of a party opponent; and (2) impeachment evidence against Drs. Canfield and Veronneau.  (*Id.*)  Dr. Veronneau worked with Dr. Canfield at CAMI in Oklahoma City, and is an expert whom Defendants plan to call in this case.  The Court will address each argument in turn.

Federal Rule of Evidence 801(d)(2) provides that

> a statement is not hearsay if . . . [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

8

Fed. R. Evid. 801(d)(2).  The statement by Dr. Jordan cannot be admitted as an admission by a party opponent as to S-TEC because Dr. Jordan, as an employee of the Government, cannot be considered an agent or representative of S-TEC.  Nevertheless, Plaintiffs assert that "[t]his is not a criminal case, so the admission of this evidence does not raise *Bruton* issues."  (Pls.' Br. at 4 (citing *Bruton v. United States*, 391 U.S. 123 (1968)).)  Plaintiffs do not elucidate this point, but ostensibly the *Bruton* reference means that, contrary to *Bruton*, there would be no problem here with admitting the statement of one co-defendant against another, with or without a limiting instruction.  *See Bruton*, 391 U.S. at 137 ("Despite the concededly clear instructions to the jury to disregard [co-defendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.").  Assuming the statement is admissible against the Government, this Court remains unconvinced by the unsupported argument that the Government's admission may be used as substantive evidence against S-TEC on such a crucial issue as liability.

Because the present motion is made by S-TEC, the Court will not rule on Plaintiffs' argument that Dr. Jordan's statement is admissible against the Government under Rule 801(d)(2) as an admission by a party opponent; if the Government objects at trial, the Court will address the issue at that time.  The Court notes, however, the common law principle that an agent of the Government generally cannot bind the sovereign, particularly in a criminal case.  *See, e.g., United States v. Prevatte*, 16 F.3d 767, 779 n.9 (7th Cir. 1994); *see also United States v. Garza*, 448 F.3d 294, 299 (5th Cir. 2006); *United States v. Arroyo*, 406 F.3d 881, 888 (7th Cir. 2005).  Nevertheless, there is ample authority to allow statements as admissions by a party opponent in

the appropriate context involving the Government, such as an FTCA action. *See Limone v. United States*, --- F. Supp. 2d ----, 2007 WL 2141959, at *9 n.31 (D. Mass. July 26, 2007) (finding testimony of currently unavailable FBI agents before House Committee on Government Reform admissible as party admissions over government's hearsay objection, even though at time of testimony agents were no longer employed by government); *Duque v. United States*, No. 05-1417, 2006 WL 2348533, at *10 n.7 (N.D. Ga. Aug. 9, 2006) (suggesting that statement by doctor working at United States prison medical facility might be admissible against the government); *Rodriguez v. United States*, 69 Fed. Cl. 487, 493 n.8 (Fed. Cl. 2006) (finding deposition testimony, from separate legal proceeding, of five employees of the United States to qualify as admission by party-opponent under Rule 801(d)(2)(D) because all "all five deponents are current employees of the United States and they limited the subject matter of their statements to the scope of their employment"); *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468 (Fed. Cl. 2006) (finding Rule 801(d)(2) applicable to statements made by employee of U.S. Army Corps of Engineers in contract action against the United States); *Hurd v. United States*, 134 F. Supp. 2d 745, 749 (D.S.C. 2001) (finding that testimony regarding boating accident, given by Coast Guard personnel before National Transportation Safety Board, was admission of party opponent, and thus not hearsay, when offered in FTCA action against United States); *Gess v. United States*, 952 F. Supp. 1529, 1534 n.7 (M.D. Ala. 1996) (finding report prepared by Air Force Office of Special Investigations admissible against government under Rule 801(d)(2) in FTCA action by Air Force hospital patients because report was conducted consistent with Air Force policy, reviewed for trustworthiness, and never contradicted); *see also Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993) (suggesting that statements by Police Chief in newspaper article might

10

be considered an admission by a party-opponent under Rule 801(d)(2), but ultimately concluding that entire article must be excluded for purposes of summary judgment analysis because article itself was hearsay with other hearsay statements not attributable to police chief included therein); *Huber v. United States*, 838 F.2d 398, 403 (9th Cir. 1988) (suggesting that a report by the Coast Guard regarding the sinking of a ship might be admissible, under Rule 801(d)(2), against the government in an FTCA action but for the statutory prohibition on the use of such reports in litigation).  The Court will address any objections by the Government as to admissibility of the Jordan editorial when and if such objections arise.

The second basis for admitting Dr. Jordan's statement is impeachment.  Specifically, Plaintiffs seek to impeach the testimony of Drs. Canfield and Veronneau.  In a prior motion, the Government explained the scope of the anticipated testimony by these two doctors.  In particular,

> Dr. Canfield will testify at trial regarding the toxicology screening performed on the Jacoby specimens and on the detection of butalbital in Mr. Jacoby's muscle tissue.  He will describe the distribution study his office conducted at the request of the NTSB and how, using the appropriate distribution coefficient, they can accurately estimate the concentration of the drug in Mr. Jacoby's blood at the time of the accident.  It is the opinion of Dr. Canfield that Itzhak Jacoby was impaired at the time of the accident by the level of barbiturate in his blood.  He experienced, as a result of this drug, a slowing of his response times, diminished muscle control, and reduced cognitive functions.

(Gov't Br. Docket No. 285 at 7-8 (internal citations omitted).)  Similarly,

> Dr. Veronneau will testify at trial regarding the special medical considerations present in the aerospace environment. . . . Dr. Veronneau [also] will testify [that] Itzhak Jacoby was not legal for exercising flight privileges on the day of the accident due to his non-disclosures on his applications for medical certification, the drugs he was using, and the undeclared medical conditions for which he was using the undeclared medications. . . . [In addition,] Dr.

> Veronneau will testify [that Dr.] Jacoby was impaired at the time of
> the accident from the butalbital he had taken and which was found to
> have been present at a therapeutic level.  As a physician, Dr.
> Veronneau will describe the sedative effects this drug has on the body
> and how it would contribute to a decrement in pilot performance.  It
> is Dr. Veronneau's opinion that [Dr.] Jacoby's inability to respond
> appropriately to the mechanical problem with his aircraft was due in
> large part to his impairment from barbiturates and acute sleep loss,
> leading to a loss of spatial orientation and departure from controlled
> flight.

(*Id*. at 8-10 (internal citations omitted).)  Thus, because Drs. Canfield and Veronneau worked

under Dr. Jordan, Plaintiffs seek to use Dr. Jordan's statement to challenge their credibility.  As

Plaintiffs argue, the Government and S-TEC "cannot rely on the evidence from Dr. Canfield and

Dr. Veronneau, and suppress the fact that their ultimate boss disagreed with them."  (Pls.' Br. at

5.)

    In that regard, Plaintiffs seek to admit Dr. Jordan's statement not for the truth of the

matter asserted, but for impeachment purposes.  If the statement is not being offered for the truth

of the matter, then it is, by definition, not hearsay.  *See* Fed. R. Evid. 801(c) ("'Hearsay' is a

statement, other than one made by the declarant while testifying at the trial or hearing, offered in

evidence to prove the truth of the matter asserted.").  Indeed, "[i]f the significance of an offered

statement lies solely in the fact that it was made, no issue is raised as to the truth of anything

asserted, and the statement is not hearsay."  *See id.*, advisory committee notes (1972 proposed

rules).

    Importantly, S-TEC never addresses Plaintiffs' argument that Dr. Jordan's statement is

admissible for impeachment purposes.  Instead, S-TEC primarily focuses on the admission by a

party opponent issue.  Alternatively, S-TEC argues that the statement is inadmissible because it

is an opinion as to causation and Dr. Jordan should not be permitted to provide lay testimony in this circumstance. While that might be true, the Court's ruling here is that it is admissible for impeachment purposes, not for the truth of the matter, i.e., not for the substantive opinion on causation.

Furthermore, S-TEC contends that the statement by Dr. Jordan is "taken out of context" and therefore should be excluded as prejudicial under Rule 403. The Court finds that the probative value of the statement for impeachment purposes outweighs the danger of unfair prejudice. Indeed, the Court will grant S-TEC's alternative request that if Dr. Jordan's statement is admitted, his entire editorial should be admitted as well, so as to provide the necessary "context." In other words, allowing the entire editorial should mollify S-TEC's concern in that regard.

Finally, Plaintiffs have not objected to Dr. Jordan's Affidavit of November 21, 2006, which attempts to explain the statement contained in his editorial. Indeed, Plaintiffs have argued that it is only fair to allow Dr. Jordan's editorial into evidence to provide the full story, so to speak, such that Plaintiffs would be in a poor position to argue that Dr. Jordan's Affidavit is somehow inadmissible. But because S-TEC failed, until its reply brief, to make the alternative argument that the Affidavit should be admissible if Dr. Jordan's statement is admitted over S-TEC's objection, Plaintiffs have not had an adequate opportunity to respond. Therefore, the Court will reserve decision on the admissibility of the Affidavit, but notes that the residual hearsay exception appears well-suited to the circumstances. *See* Fed. R. Evid. 807;[6]

---

[6] Rule 807 provides that a

> statement not specifically covered by Rule 803 or 804 but having
> equivalent circumstantial guarantees of trustworthiness, is not

*Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 113 (3d Cir. 2001) (finding no abuse of discretion in district court's admission of affidavit under Rule 807); *Schepise v. Saturn Corp.*, No. 94-385, 1997 WL 897676, at *2 n.1 (D.N.J. July 30, 1997) (finding affidavit by author of scholarly articles admissible to rebut the interpretation of those articles by another witness); *see also United States v. Wright*, 363 F.3d 237, 246 (3d Cir. 2004) (finding no clear error in district court's exclusion of testimony by criminal defendant's attorney regarding what the defendant said to his attorney, where such statement, *inter alia*, was not made under oath). Indeed, "[t]he validity of the residual exceptions to the hearsay rule was expressly addressed by Congress during its consideration of the Federal Rules of Evidence," and Congress ultimately included them "fearing that without these provisions the more established exceptions would be unduly expanded in order to allow otherwise reliable evidence to be introduced." *United States v. Popenas*, 780 F.2d 545, 547 (6th Cir. 1985) (remanding to district court to consider admissibility of affidavit under residual hearsay exception).

In summary, the entire editorial of Dr. Jordan will be admitted as impeachment evidence against Drs. Canfield and Veronneau. The Court will reserve judgment on the admissibility of

---

excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed. R. Evid. 807.

the editorial as substantive evidence against the Government until such time as the Government might object.  Similarly, the Court will reserve judgment as to the admissibility of Dr. Jordan's Affidavit of November 21, 2006 until Plaintiffs have had an opportunity to articulate an objection, if any.

### B.     Defendants' motions *in limine* to exclude NTSB documents

Defendants filed separate motions *in limine* seeking to exclude reports produced by the NTSB's employees.  Specifically, the Government seeks to exclude a document entitled "Recorded Radar Study" as well as a 2001 NTSB Safety Recommendation, whereas S-TEC seeks to exclude a Materials Laboratory Factual Report.  Plaintiffs filed a consolidated response to these two motions, but the Court will address each motion separately.

### 1.     Docket No. 308 - Governments's motion *in limine* to exclude the NTSB's Safety Recommendations and analytical studies

In September 2001, the NTSB sent a twenty-two page "Safety Recommendation" to the Administrator of the FAA, which included suggested changes in air traffic controller training and procedures related to emergencies.  This document discussed six different accidents or incidents over a three-year period, one of which was the Jacoby accident.  From these different accidents, the NTSB developed several suggestions for changes in air traffic controller training.  In April 2000, an employee of the NTSB issued a document entitled "Recorded Radar Study," which explained the circumstances surrounding the Jacoby crash by relying on the data extrapolated from the radar of the flight.  The Government seeks to exclude these two documents on the

15

grounds that they fall within the statutory prohibition of 49 U.S.C. § 1154(b).

Section 1154(b) provides that "[n]o part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report." 49 U.S.C. § 1154(b). Federal regulations explain that a "Board accident report means the report containing the Board's determinations, including the probable cause of an accident" and "no part of a Board accident report may be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such reports." 49 C.F.R. § 835.2. By contrast, "[f]actual accident report means the report containing the results of the investigator's investigation of the accident. The Board does not object to, and there is no statutory bar to, admission in litigation of factual accident reports." *Id.* Thus, the statute and corresponding regulations make clear that an individual investigator's factual report is admissible, but a report by the full Board is not admissible, in whole or in part.

Accordingly, for purposes of the Government's instant motion, the Court must determine whether the 2001 Safety Recommendation is a report of the Board or an investigator's report. The answer is simple and unequivocal: It is a report of the Board, signed by the Acting Chairman and concurred with by three other members of the NTSB.[7]

Plaintiffs argue that they "are not seeking to introduce the NTSB Safety Recommendation [as a whole] into evidence," but that "factual statements found in the Safety Recommendation should be admissible." (Pls.' Br. at 5.) As support for this argument, Plaintiffs point to an

---

[7] The NTSB has five members, including the Chairman. At the time of the 2001 Safety Recommendation, it appears that there were only four members due to the Chairman's vacancy. Thus, the 2001 Safety Recommendation at issue here was issued by a unanimous Board.

Eastern District of Michigan case, *Petition of Cleveland Tankers, Inc.*, which recognized that

courts have placed a "judicial gloss" on the strict prohibition of Board reports by allowing the

factual contents of such reports, but excluding opinions or conclusions contained therein.  821 F.

Supp. 463, 464 (E.D. Mich. 1992).  Plaintiffs also direct the Court's attention to a District of

Nebraska case, *Budden v. United States*, in which the court analyzed an NTSB report, containing,

*inter alia*, a factual report, pilot/operator aircraft accident report, witness statements, weather

records, transcript of recorded communication, and the district court ultimately concluded that

the report was not automatically excluded under the statute because it contained "no opinions or

conclusions as to the probable cause of the crash"  748 F. Supp. 1374, 1377 (D. Neb. 1990),

*vacated on other grounds*, 963 F.2d 188 (8th Cir. 1992).  Finally, Plaintiffs cite a case from the

Court of Appeals for the D.C. Circuit in other parts of their brief, but not for the instant issue.

For the reasons that follow, this Court finds the reasoning of the D.C. Circuit, among others, to

be more persuasive.

In *Chiron Corp. v. NTSB*, the D.C. Circuit carefully examined § 1154(b) and its

interpreting regulations.  198 F.3d 935 (D.C. Cir. 1999).  After discussing cases from the Tenth

and Fifth Circuits, the *Chiron* court agreed with those circuits in holding that "under the plain

terms of the statute, NTSB reports are inadmissible in civil litigation."  *Chiron*, 198 F.3d at 941.

The court explained that "admitting Board reports into civil litigation can have the unsavory

[effect] of embroiling [the] NTSB in the interests of civil litigants.  Thus, the statute means what

it says: No part of the Board's actual report is admissible as evidence in a civil suit."  *Id.*  As

support, the D.C. Circuit quoted from legislative history, which clearly stated that "the ability of

the NTSB to conduct investigations independently, thoroughly, and in a timely manner for the

benefit of the public, should not be compromised." *Id.* at 942 (quoting Senate Committee on Commerce, Science, and Transportation). This Court agrees with the holding and reasoning of *Chiron*.

Indeed, the NTSB, as an independent agency, is charged with providing recommendations on safety improvements to other agencies. Congress sought to insulate the NTSB from expending unnecessary energy choosing its words, lest those words become part of the arsenal of a civil litigant. It is easy to understand why Congress adopted this policy. That is, if the NTSB's core function is to identify methods to improve safety in transportation, then its core function is directed at the future, and in saving lives. To accomplish this task, the NTSB must analyze past accidents, attempt to isolate common elements, and thereby deduce a prescription to help minimize such accidents in the future. In making such prescriptions, Congress decided that the NTSB should be allowed to speak freely. If civil litigants were allowed to utilize such recommendations to prove or disprove liability, then there is considerable danger that those wanting to use the NTSB's reports would have too great a motive to try to influence the contents of those reports in advance. *See* 49 C.F.R. § 835.3 (recognizing "Congress's strong desire to keep the Board free of the entanglement of [lawsuits]").

While Plaintiffs are certainly correct that the 2001 Safety Recommendation contains factual statements separate and apart from the Board's conclusions and opinions, this Court interprets § 1154(b) in the same manner as the *Chiron* court: a categorical bar to admission of reports issued by the Board. The impropriety of attempting to dissect Board reports for factual statements while excising opinions and conclusions is too great to adopt Plaintiffs' argument. Another look at the statutory language is telling: "*No part* of a report of the Board, related to an

18

accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report." 49 U.S.C. § 1154(b) (emphasis added). Thus, Congress established a clear and simple method to prevent outside influence on a Board report by disallowing the use of such reports in civil litigation, an enactment which automatically eliminated any motive to influence the Board's reports. It takes no twisting of Congress's words to ascertain its intent to exclude Board reports like the 2001 Safety Recommendation from being admitted into evidence in this case. On the contrary, it takes considerable parsing of the statute and regulations, and unpersuasive support in caselaw, to reach Plaintiffs' position on this piece of evidence. Therefore, the Court will exclude the 2001 Safety Recommendation in its entirety.

As noted previously, the Government also seeks to exclude, under § 1154(b), a document entitled "Recorded Radar Study," which is identified below the title as the "Specialist's Report of Investigation By Kristin M. Bolte, Ph.D." The Government points to 49 C.F.R. § 835.3 to support its argument that the radar study should be excluded. Section 835.3 addresses the scope of permissible testimony by Board employees. Specifically, subsection (c) states that "current Board employees are not authorized to testify regarding other employee's reports, or other types of Board documents, including but not limited to safety recommendations, safety studies, safety proposals, safety accomplishments, reports labeled studies, and analysis reports." 49 C.F.R. § 835.3(c). From this, the Government concludes that the Recorded Radar Study itself is not admissible because "employees are not authorized to testify regarding . . . reports labeled studies." (Gov't Br. at 5 (quoting § 835.3(c)).)

The Government's argument is unpersuasive because § 835.3 clearly regulates *testimony*

19

by current Board employees.  The regulation does not expand upon § 1154(b)'s prohibition on which documents are statutorily proscribed as admissible evidence.  Instead, the regulation addresses the documents about which a Board employee may testify.  Indeed,  § 835.2 is more directly on point inasmuch as it declares that while Board reports are not admissible, "[f]actual accident report means the report containing the results of the investigator's investigation of the accident" and "[t]he Board does not object to . . . admission in litigation of factual accident reports."  49 C.F.R.  § 835.2.  The "Recorded Radar Study" is Ms. Bolte's "Report of Investigation," which more reasonably falls within the domain of § 835.2's explicit statement that investigator's reports are not automatically excluded, than within § 835.3(c)'s proscription of *testimony*.  Accordingly, the radar study will be admitted into evidence over the Government's objection.  The Court notes, however, that neither party has discussed who will be testifying and laying a foundation about Ms. Bolte's report, and the applicability of § 835.3(c) in that circumstance if the witness is a current employee of the Board.  Thus, the Court reserves decision on whether that regulation applies to a particular witness's *testimony*, but holds here that the report itself is not excluded by any statute or regulation.

Finally, the Government makes an alternative argument that the 2001 Safety Recommendation is not admissible because it is not relevant under Federal Rule of Evidence 402.  Because this Court has already determined that the Recommendation is barred from admission by statute, the Court need not address this alternative argument.  The Government does not make the same relevance argument regarding the Recorded Radar Study.  Therefore, the Court will exclude the Safety Recommendation altogether, but will admit the Recorded Radar Study.

    **2.**      **Docket No. 304 - S-TEC's motion *in limine* to exclude the NTSB's Materials Laboratory Report and all references thereto**

As mentioned previously, S-TEC has filed a motion *in limine* seeking to exclude a document written by Spencer Phillips, an NTSB physical science technician in the Office of Research and Engineering. That document is clearly labeled "Materials Laboratory Factual Report." S-TEC does not argue that this report is statutorily barred from being admissible in evidence in this case. Instead, S-TEC primarily contends that Federal Rule of Evidence 803(8)(C) does not allow admissibility of this report because it lacks trustworthiness.

Rule 803(8), known as the public records exception, provides that hearsay may be admitted if it consists of "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C). S-TEC does not challenge the notion that the "Materials Laboratory Factual Report" falls within the part of the rule regarding public records or the part regarding factual findings resulting from an investigation made pursuant to authority granted by law. Instead, S-TEC hinges its entire argument on exclusion on the trustworthiness of the report.

The advisory committee notes to Rule 803 explain that the "[j]ustification for the [public records] exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Fed. R. Evid. 803(8), advisory committee notes (1972 proposed rules). Furthermore, the rule, particularly with regard to subsection (8)(C), "assumes admissibility in the first instance, but with ample provision for

escape if sufficient negative factors are present." *Id.*; *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988). As the Supreme Court noted, "a trial judge has the discretion, and indeed the obligation, to exclude an entire report or portions thereof–whether narrow 'factual' statements or broader 'conclusions'–that she determines to be untrustworthy." *Beech*, 488 U.S. at 167. Thus, it is clear that the "Materials Laboratory Factual Report" is presumed admissible under Rule 803(8)(C) unless S-TEC demonstrates that enough negative factors are present to indicate a lack of trustworthiness.

In its argument that the report lacks trustworthiness, S-TEC points to the following facts: (1) the author of the report, Mr. Phillips, was unavailable for deposition; (2) experts on both sides reached results contrary to that of Mr. Phillips; and (3) the Board's ultimate report "disregarded" some of Mr. Phillips's findings.

As to Mr. Phillips's unavailability for deposition, it is noteworthy that he suffered a severe trauma that resulted in brain injury, rendering him unavailable for these purposes. In any event, S-TEC principally relies upon the Third Circuit's decision in *Berguido v. Eastern Air Lines, Inc.* to support its argument that such lack of opportunity to cross-examine a declarant is enough to render hearsay statements untrustworthy. 317 F.2d 628, 632 (3d Cir. 1963) (finding prejudicial error in the trial court having admitted testimony by the chairman of the Civil Aeronautics Board's Structures Committee about calculations made by a Board engineer concerning an airplane's speed, angle of descent, altitude and position). What S-TEC neglects to address, however, is that *Berguido* was decided more than a decade before the Federal Rules of Evidence were adopted in 1974. Thus, the Third Circuit was not addressing the specific question of trustworthiness under the public records exception of Rule 803(8)(C). Indeed, the very fact

that Mr. Phillips is unavailable is "immaterial" in an analysis under Rule 803, the title of which is "Hearsay Exceptions; Availability of Declarant Immaterial."  Furthermore, the very theory upon which Rule 803 is premised "finds vast support in the many exceptions to the hearsay rule developed by the common law in which *unavailability of the declarant is not a relevant factor*."  Fed. R. Evid. 803, advisory committee notes (1972 Proposed Rules) (emphasis added).  As Plaintiffs aptly note, S-TEC's argument regarding unavailability "is simply another way of arguing that the report is hearsay."  (Pls.' Br. at 9.)  Accordingly, this Court will not consider Mr. Phillips's unfortunate unavailability as indicative of a lack of trustworthiness of his public report.[8]

S-TEC's second basis for a finding of untrustworthiness focuses on the fact that its experts, as well as those of Plaintiffs, have reached different conclusions than those contained in Mr. Phillips's report.  As Plaintiffs persuasively argue, however, "[d]isagreement of another expert does not render a report untrustworthy."  (Pls.' Br. at 7.)  Indeed, disagreement goes to the weight of the evidence, rather than its admissibility.  As the Fifth Circuit has explained:

> in determining trustworthiness under Rule 803(8)(C), credibility of
> the report itself or the testimony in the report are not the focus.

---

[8] Folded into its argument regarding unavailability, S-TEC also argues that such unavailability leaves the parties with "no information about [Mr. Phillips's] skills or experience, the methods he used to reach his conclusions, the extent of the investigation he conducted, or the sources he relied on to make his final determinations."  (S-TEC Br. at 9.)  While the parties might lack this information, it does not necessarily follow that the report therefore should have a presumption of untrustworthiness.  On the contrary, simply raising this specter does not overcome "the assumption that a public official will perform his duty properly."  Fed. R. Evid. 803(8), advisory committee notes (1972 proposed rules).  Had S-TEC presented affirmative evidence that called into question Mr. Phillips's skills, experience, or methodology, then such evidence *might* have been sufficiently indicative of untrustworthiness.  But S-TEC's present argument essentially invites this Court to apply a Rule 702 analysis regarding the admissibility of expert testimony to a public record.  The Court declines S-TEC's invitation in that regard.

> Instead the focus is the report's reliability.  As the Supreme Court stated in *Beech Aircraft*, "[t]his trustworthiness inquiry-and not an arbitrary distinction between 'fact' and 'opinion'-was the Committee's primary safeguard against the admission of unreliable evidence." 488 U.S. at 167 (emphasis added).  The Rule 803 trustworthiness requirement, therefore, means that the trial court is to determine primarily whether the report was compiled or prepared in a way that indicates that its conclusions can be relied upon.

*Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991) (concluding that the trial court overstepped its bounds by excluding a public record because the trial court should have addressed the "credibility" of the report as more of a question of weight rather than admissibility).  Similarly, the Third Circuit has advised that "a report may be untrustworthy if the report appears to have been made subject to a suspect motivation" such as "if the public official or body who prepared the report has an institutional or political bias."  *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1342 (3d Cir. 2002).  A "report might also be untrustworthy where it is made in contemplation of litigation."  *Id.*  There is nothing here to suggest that Mr. Phillips's report is the product of institutional or political bias or that it was made in contemplation of litigation.  On the contrary, Congress has endeavored to ensure that the NTSB remains free from the entanglement of litigation.  Simply because the NTSB has passed regulations explicitly declaring factual reports outside the scope of 49 U.S.C. § 1154(b) does not mean that those factual reports are prepared in anticipation of litigation.  Moreover, the NTSB is uniquely situated to be as apolitical as possible insofar as it is an independent agency, with members from both major political parties,[9] charged with providing safety recommendations regarding

---

[9] "The Board is composed of 5 members appointed by the President, by and with the advice and consent of the Senate. Not more than 3 members may be appointed from the same political party. At least 3 members shall be appointed on the basis of technical qualification, professional standing, and demonstrated knowledge in accident reconstruction, safety

transportation issues.  For these reasons, the disagreement of experts with the "Materials

Laboratory Factual Report" is not a sufficient basis upon which to conclude that the report is

untrustworthy for purposes of Rule 803(8)(C).

      S-TEC's third argument for untrustworthiness is tied closely to the logic behind its

second argument.  That is, S-TEC argues that the "Materials Laboratory Factual Report" is

untrustworthy because the Board's ultimate report "disregarded" some of Mr. Phillips's findings.

That again says little about the trustworthiness of the report because it is to be expected that the

Board's final report would draw upon all the investigators' reports in order to reach a conclusion.

In so doing, the Board is likely to accept parts of reports, reject others, and find still other parts

conceivably accurate, but irrelevant for the Board's ultimate purposes.  In sum, S-TEC has failed

to overcome the presumption of admissibility attendant upon public records such as the

"Materials Laboratory Factual Report."  Therefore, the report will be admitted into evidence

pursuant to Rule 803(8)(C).[10]

      Finally, S-TEC argues in the alternative that the report should be excluded under Rule

403 as being needlessly cumulative and unduly prejudicial.  Specifically, S-TEC declares that the

report is needlessly cumulative because Plaintiffs' expert Dr. McSwain has already submitted an

expert report that also concludes that the turn coordinator showed no signs of rotational contact

---

engineering, human factors, transportation safety, or transportation regulation."  49 U.S.C. §
1111(b).

   [10] S-TEC also makes a dependent argument inasmuch as it asserts that due to the
untrustworthiness of the "Materials Laboratory Factual Report," all portions of the NTSB Factual
Report mentioning or referring to the Mr. Phillips's report are similarly unreliable.  Furthermore,
S-TEC asserts that all of Plaintiffs' experts who rely on the report must be precluded from
testifying about the report.  Because the Court has concluded that the report is not sufficiently
untrustworthy and therefore is admissible, S-TEC's dependent arguments in this regard are moot.

and was, therefore, likely inoperative at the time of the accident.  This Court recognizes that there can reach a point where essentially identical evidence can be so needlessly cumulative as to cross the high threshold of being substantially more prejudicial than probative.  *See Robert S. v. Stetson School, Inc.*, 256 F.3d 159, 170 (3d Cir. 2001) (finding that "the District Court had a reasonable basis for regarding" two proposed experts' testimony as cumulative because they were going to testify to the exact same issues already presented by a previous expert); *Elcock v. Kmart Corp.*, 233 F.3d 734, 753 (3d Cir. 2000) (finding no abuse of discretion in district court's exclusion of evidence as cumulative, but noting that "were we acting as the trial court in the case at bar, we likely would have admitted some of this additional evidence").  "Evidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates."  *United States v. Cross*, 308 F.3d 308, 326 (3d Cir. 2002) (quoting *United States v. Williams*, 81 F.3d 1434, 1443 (7th Cir. 1996) (quotation marks omitted)).  Under this standard, the Court cannot reasonably conclude that the "Materials Laboratory Factual Report" would so lengthen the trial or otherwise prejudice S-TEC in the jury's determination of the truth that it outweighs the report's probative force.  Therefore, the Court finds that the report should not be excluded as needlessly cumulative under Rule 403.

1   S-TEC's other argument that the report is "unduly prejudicial" is equally unavailing.  S-
2 TEC contends that because the report comes from an official source like the NTSB, a jury is
3 likely to give unwarranted weight to its findings.  As noted previously, under Rule 403,

4    prejudicial means something more than merely harmful; it refers to the negative consequence of

5    unfair prejudice.  *See Ansell*, 347 F.3d at 525 ("[T]he . . . prejudice against which the law guards

6    [is] . . . *unfair* prejudice . . . prejudice of the sort which cloud[s] impartial scrutiny and reasoned

7    evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as

8    found . . . .  [P]rejudice does not simply mean damage to the opponent's cause.  If it did, most

9    relevant evidence would be deemed prejudicial.") (internal quotation marks omitted).  The Court

10    is not persuaded that the official nature of the report is a sufficient basis to conclude that the

11    evidence is unfairly prejudicial.  Indeed, as Plaintiffs argue, such a conclusion "would gut the

12    admissibility of all evaluative reports under Rule 803(8)(C) [the public records hearsay

13    exception] because this Rule 403 argument is in direct contradiction to the presumption that

14    evaluative reports are admissible under Rule 803(8)(C)."  (Pls.' Br. at 10.)  Therefore, the Court

15    finds that the mere fact of being a public record produced by the NTSB does not render the

16    evidence prejudicial to a degree unfairly greater than its probative value.

17

18           **C.**    **Docket No. 381 - Plaintiffs' motion for clarification concerning expert**
19                      **testimony of William Jeffrey Edwards**
20
21          In this Court's Opinion & Order dated August 27, 2007, the Court addressed numerous

22    motions *in limine* regarding the scope and admissibility of various experts' testimony.  One such

23    expert was William Jeffrey Edwards, Plaintiffs' expert, who was designated to testify "'from the

24    perspective of an expert pilot, instructor, and accident investigator.'"  *In re Jacoby Airplane*

25    *Crash Litig.*, No. 99-6073, slip. op. at 52 (D.N.J. Aug. 27, 2007) (quoting Pls.' Br. at 13.)  Mr.

26    Edwards's expert report contained ten paragraphs of opinions, and the Court excluded testimony

27

27  regarding any of the opinions contained in paragraphs 3, 5, 6, 7, 8, and 9 of Section F of his

28  expert report.

29          In the instant motion, Plaintiffs "do not challenge the Court's ruling as to the permitted

30  scope of Mr. Edwards's testimony, but seek clarification with respect to one aspect of the Court's

31  ruling. [Specifically, o]n page 57 of the Court's Opinion and Order, the Court rule[d] that if

32  Plaintiffs have an expert who can testify concerning tests that would demonstrate that an

33  uncommanded roll results under circumstances where the turn coordinator is not rotating and the

34  ready light comes on, Mr. Edwards's opinion in paragraph 3 of his report might be admissible."

35  (Pls.' Br. at 1.)

36          The portion of this Court's prior Opinion to which Plaintiffs' refer is as follows:

37                  In paragraph 3 of his report, Mr. Edwards opines that "[t]ests
38          conducted during the course of this investigation reveals [sic] there
39          are ways to cause the turn coordinator to stop rotating and still be able
40          to generate a 'ready' light and get an uncommanded roll."  (Edwards
41          Report at 42, ¶ 3.)  It is not clear from Mr. Edwards's report what
42          these "tests" encompassed, who performed them, what standards were
43          used, or what was the error rate.  Indeed, the notion that the ground
44          wire for the turn coordinator can be disconnected and still generate a
45          "ready" signal has been tossed around rather casually in this case.  If
46          Plaintiffs have an expert that can testify to these tests or demonstrate
47          this anomalous result by some other means, then the evidence might
48          be admissible.  But Mr. Edwards should not be able to simply tell the
49          jury, as an expert, that some ambiguous "tests" have been performed
50          that corroborate Plaintiffs' theory of the case.  Rule 702 might not
51          require perfect grounds, but it does require good grounds, which is
52          still above what Mr. Edwards advances for this opinion.  *See Paoli*,
53          35 F.3d at 742 ("[T]he expert must have 'good grounds' for his or her
54          belief.") (quoting *Daubert*).
55                  Furthermore, it is not clear how Mr. Edwards is qualified to
56          make some of the statements contained in paragraph 3.  For example,
57          he asserts that the conceivable situation in which the ground wire
58          becomes disconnected but the ready light still illuminates is a "failure
59          [that is] both a product design defect and a manufacturing defect."

28

60   (Edwards Report at 43, Sec. F, ¶ 3.)  Again, Plaintiffs expressly
61   disavow any assertion that Mr. Edwards is an expert in engineering
62   or design of autopilot systems.  Indeed, Mr. Edwards testified at his
63   deposition that he "was not a design engineer" nor did he have any
64   manufacturing experience with respect to autopilots generally, much
65   less turn coordinators.  (Edwards Dep. Jan. 14, 2004 at 62:11, 63 to
66   65.)  In that regard, he cannot opine, as an expert pilot or otherwise,
67   that the turn coordinator was designed or manufactured defectively.

68
69 *In re Jacoby Airplane Crash Litig.*, No. 99-6073, slip. op. at 54 (D.N.J. Aug. 27, 2007)

70 (emphasis added).  Plaintiffs, in the instant motion, explain that they "do have such an expert,

71 John Nixon," who conducted the unspecified tests to which this Court referred in its prior

72 Opinion.  (Pls.' Br. at 1.)  Plaintiffs further explain that Defendants have not challenged the

73 expertise of Mr. Nixon or the results of the tests that he conducted, and thus his testimony was

74 not fully discussed in the previous motions to exclude other experts.  Therefore, Plaintiffs intend

75 "to elicit testimony from Mr. Edwards that assumes the truth of the findings of Dr. McSwain and

76 Mr. Nixon . . . [and] Mr. Edwards, based on the findings of these two experts, will show how the

77 flight path of the Jacoby flight is consistent with [the] scenario [found by Drs. McSwain and

78 Nixon], and as pilot expert, will explain how a pilot would react if his instruments were

79 incorrectly telling him that the autopilot was operable."  (*Id.* at 1-2.)

80   S-TEC vigorously objects to Plaintiffs' motion for clarification by arguing that the Court

81 has already ruled that Mr. Edwards lacks the qualifications to render an engineering opinion, and

82 that Mr. Edwards may not testify that there was a manufacturing or design defect with the turn

83 coordinator.  But S-TEC's objections misunderstand Plaintiffs' request.  Indeed, Plaintiffs, in

84 their reply brief, expressly state that they "do *not* challenge the Court's ruling that Mr. Edwards

85 lacks the qualifications to render an engineering opinion.  Nor do Plaintiffs request that the Court

86    rule that Mr. Edwards may testify that there was a manufacturing or design defect with the turn

87    coordinator."  (Pls.' Reply Br. at 1.)

88            Instead, Plaintiffs simply request that the Court, now that it knows of Mr. Nixon, allow

89    Mr. Edwards to testify based on and in reliance of the unchallenged expert opinions of Mr.

90    Nixon.  The Court agrees with Plaintiffs and will allow Mr. Edwards to testify regarding some of

91    the opinions in paragraph 3 of his expert report.  *See Dura Auto. Sys. of Indiana, Inc. v. CTS*

92    *Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (noting that "it is common in technical fields for an

93    expert to base an opinion in part on what a different expert believes on the basis of expert

94    knowledge not possessed by the first expert; and it is apparent from the wording of Rule 703 that

95    there is no *general* requirement that the other expert testify as well.").  Specifically, paragraph 3

96    of Mr. Edwards's report declares:

97                    Tests conducted during the course of this investigation reveals [sic]
98                    there are ways to cause the turn coordinator to stop rotating and still
99                    be able to generate a 'ready' light and get an uncommanded roll servo
100                   softover or hardover . . . One method to be able to cause this type of
101                   failure is to simply lose aircraft ground on the S-TEC turn coordinator
102                   wiring harness.
103
104   (Edwards Report at 42-43, ¶ 3.)  Accordingly, inasmuch as Mr. Nixon will testify about and

105   confirm these tests, and Mr. Edwards will confirm that he relied on them,[11] the Court will allow

106   Mr. Edwards to testify from his perspective of an "expert pilot, instructor, and accident

107   investigator . . . how a pilot confronted with an autopilot system that had failed would have

---

[11] While S-TEC is correct that Mr. Edwards should "establish that he actually relied on
Mr. Nixon's findings in the course of his own investigation and in the formulation of his own
opinions," (S-TEC Br. at 6.), the Court expects that a proper foundation will be laid for each and
every witness's testimony, and no exception would be granted in Mr. Edwards's testimony in any
event.

108    responded, and as to how the pattern of the accident corroborates or fits the expert opinion that

109    the autopilot system, specifically the turn coordinator and the Ready light, had failed." *In re*

110    *Jacoby Airplane Crash Litig.*, No. 99-6073, slip. op. at 52 (D.N.J. Aug. 27, 2007) (quoting Pls.'

111    Br. at 13.).  The Court stands by its original ruling in all other respects, particularly with regard to

112    excluding Mr. Edwards's testimony regarding his conclusion in paragraph 3 that any failure of

113    the turn coordinator is both a product design and a manufacturing defect.  *Id.* at 58.

114

115    **D.    Docket Nos. 317 - S-TEC's motion for summary judgment based on**
116         **violations of public policy**

117         In the instant motion, S-TEC has moved for summary judgment as to any claims brought

118    on behalf of the Estate of Dr. Jacoby and his Maryland S Corporation, but not the Estates of Mrs.

119    Jacoby or Atira Jacoby, or Mrs. Orit Jacoby Carroll.[12]  S-TEC's motion is "based on [Dr.]

120    Jacoby's knowing and intentional violations of clearly established and dominant public policies

121    designed to promote aviation safety."  (S-TEC's Reply Br. at 1.)

122         At the outset, the Court must address a letter from S-TEC to this Court dated March 30,

123    2007, in which S-TEC requests leave to supplement its submissions in support of its motion for

124    summary judgment.[13]  Specifically, S-TEC points to a report released on March 27, 2007 by the

125    United States House of Representatives' Committee on Transportation and Infrastructure.  That

126    report, entitled "FAA Oversight of Falsification on Airman Medical Certificate Applications"

---

[12] The Government has not joined in S-TEC's motion for summary judgment, nor has it filed its own motion.

[13] Subsequent to this letter, S-TEC filed a motion to supplement the record, but for purposes of this discussion, the Court will reference the letter.

127    makes specific reference to the Jacoby incident.  In particular, as S-TEC explains, "[t]he report

128    from Congress contains directly relevant and highly current information, statistical and

129    otherwise, emphasizing the substantial public policy interest in full and honest disclosure of

130    medical conditions in applications for Airman Medical Certificates so to protect the public

131    safety."[14]  (S-TEC Mar. 30, 2007 Letter at 1.)  Furthermore, "the report highlights the Jacoby

132    accident as an example of the public safety threat presented by pilot dishonesty and inadequate

133    governmental policing of medical certificate applications[, and thereby] urges more stringent

134    regulations and regular spot checking for these applications."  (*Id*.)

135         Having filed its motion for summary judgment in October 2006, the report of March 27,

136    2007 obviously was not available for S-TEC to include in its original submission to this Court.

137    Accordingly, S-TEC seeks to provide that report to the Court now.  The Court grants S-TEC's

138    request insofar as the record will be deemed supplemented with the report.  The Court has

139    located the on from the Committee's website, thus the Court can decide the instant motion

140    without further delay.  S-TEC original and reply briefs, along with its letter explaining the

141    importance of the report, are sufficient for this Court to understand how the report buttresses S-

142    TEC's argument regarding public policy.

143         Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will

144    be granted

---

[14] While S-TEC characterizes it as a "report from Congress," the Court hastens to note that the report was prepared by the Oversight and Investigations *Majority Staff* of the *Committee* on Transportation and Infrastructure and subsequently released by the Chairman of the Committee.  Thus, it is a bit of a stretch to conclude that the staff of the majority party of a committee in one house of a bi-cameral legislature qualifies for the designation of being a "report from Congress."

145          if the pleadings, depositions, answers to interrogatories, and
146          admissions on file, together with the affidavits, if any, show that
147          there is no genuine issue of material fact and that the moving party
148          is entitled to a judgment as a matter of law.

149    Fed. R. Civ. P. 56(c); *see also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Chipollini v.*

150    *Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987). Summary judgment may be granted only

151    if the movant shows that "there exists no genuine issue of material fact that would permit a

152    reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d

153    Cir. 1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's

154    favor with regard to that issue. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). A

155    fact is material if it influences the outcome under the governing law. *Id.* at 248; *see also Jersey*

156    *Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).

157        The substantive law will identify which facts are "material." *Anderson*, 477 U.S. at 247-

158    48. Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the

159    governing law will properly preclude the entry of summary judgment." *Id.* at 248. An issue is

160    "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that

161    issue. *Id.* A district court faced with a summary judgment motion must view all evidence and

162    the inferences to be drawn therefrom in the light most favorable to the non-movant. *Matsushita*

163    *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Peters v. Del. River*

164    *Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994). It is inappropriate for a district

165    court to resolve factual disputes or make credibility determinations at the summary judgment

166    stage. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

167    Indeed, "where the non-moving party's evidence contradicts the movant's, then the non-movant's

168    must be taken as true." *Id.*

169          This does not mean, however, that a district court may ignore the weight of the evidence.

170    *Id.* "[I]f the non-movant's evidence on any essential element of the claims asserted is merely

171    'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor

172    of the moving party." *Peterson v. Am. Tel. & Tel. Co.*, Civ. A. No. 99-4982, 2004 WL 190295,

173    at *3 (D.N.J. Jan. 9, 2004) (quoting *Anderson*, 477 U.S. at 249).  Therefore, to raise a genuine

174    issue of material fact, the summary judgment opponent "'need not match, item for item, each

175    piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla'

176    standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d

177    Cir. 1993); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in

178    support of the [nonmovant's] position will be insufficient; there must be evidence on which the

179    jury could reasonably find for the [nonmovant].").

180          S-TEC's argument for why it is entitled to summary judgment focuses on Dr. Jacoby's

181    violation of Federal Aviation Regulations ("FARs").  S-TEC provides a long list of FARs that

182    Dr. Jacoby violated, in particular his failure to disclose to his aviation medical examiner

183    ("AME") the fact that he suffered from chronic migraine headaches and that he was taking the

184    prescription medication Fiorinal, which contained the barbiturate butalbital.  S-TEC contends

185    that the FARs are designed to promote aviation safety and thus represent "well-defined and

186    dominant public policy."  (S-TEC's Br. at 7.)  Accordingly, so S-TEC argues, Dr. Jacoby's

187    repeated violation of various FARs compels dismissal of his action because his violation of the

188    FARs is a violation of public policy.

189          As the Third Circuit noted in *Rodriquez v. United States*, FARs "have the force and effect

190    of law." 823 F.2d 735, 739 (3d Cir. 1987). But as the *Rodriquez* court also noted, New Jersey

191    law, contrary to Pennsylvania law, does not require a finding of negligence simply because an

192    individual violated a FAR. *Id.*; *Horbal v. McNeil*, 66 N.J. 99, 103 (1974) ("It is, of course, the

193    general rule that the violation of a statute, while not negligence Per se, is evidence which may be

194    considered by a jury together with all of the evidence in determining issues of negligence or

195    contributory negligence.") (citations omitted). S-TEC acknowledges the law contained in

196    *Rodriquez* and *Horbal*, but states, in a footnote, that "[a]lthough the Court must consider [Dr.]

197    Jacoby's numerous and intentional violations of the FARs at trial, S-TEC argues in this motion

198    that this action should be barred at the threshold due to the well-defined and dominant public

199    policy proscribing pilots from operating aircraft while under the influence of barbiturate-

200    containing medications." (S-TEC's Br. at 8-9 n.3)

201        What S-TEC fails to acknowledge, however, is that there is a genuine dispute of material

202    fact as to whether Dr. Jacoby was "under the influence of" Fiorinal. Indeed, although S-TEC

203    repeatedly asserts throughout its motion that Dr. Jacoby was either impaired or under the

204    influence of butalbital, conspicuously absent from S-TEC's 56.1 Statement of Undisputed

205    Material Facts is any affirmative statement that Dr. Jacoby was, in fact, impaired. On the

206    contrary, S-TEC points to the deposition testimony of Michael Evan, Jr., who was employed at

207    the Linden airfield and spoke to Dr. Jacoby on the morning of the flight. S-TEC characterizes

208    Evan's testimony as noting that Dr. Jacoby "seemed nervous and anxious to reach his

209    destination." (S-TEC Br. at 6; 56.1 Stmt. at ¶ 25.)

210        However, a review of Evan's deposition testimony reveals that it is tenuous support for

211    the conclusion that Dr. Jacoby was under the influence at the time of departure. For example,

212   counsel asked Evan if he was able to observe anything about Dr. Jacoby, either physically or by

213   his appearance, in terms of his health.  Evans responded: "No. As far as I was concerned, like – I

214   don't know, he seemed nervous, but different people's expressions and stuff like that, it could

215   just be the way he is."  (Pls.' Ex. 2, Evan Dep. at 32:18.)  Contrary to S-TEC's assertion, the

216   statement by Evans, along with Dr. Jacoby's decision to "depart in difficult weather conditions"

217   and his "inability to execute simple instructions from air traffic control" are simply S-TEC's

218   marshaled evidence that Dr. Jacoby was impaired, not undisputed proof of such impairment.

219         Given the law in New Jersey that violation of a statute or regulation is merely evidence of

220   negligence, combined with the disputed fact, among others, that Dr. Jacoby was impaired at the

221   time of the flight, it would be inappropriate to grant summary judgment.  Indeed, as Plaintiffs

222   note, summary judgment would be improper because genuine issues of material fact also remain

223   as to whether Dr. Jacoby would have been denied an Airman's Medical Certificate or pilot's

224   license had he fully disclosed all medical information to his AME or the FAA.  On this point, S-

225   TEC acknowledges that an AME is supposed to deny or defer issuance of a medical certificate

226   pending further evaluation by the FAA if a pilot discloses a condition such as chronic headaches.

227   Thus, the claims by the Estate of Dr. Jacoby cannot be barred by his violations of "public policy,"

228   i.e., the FARs, if that same "public policy" provides exceptions into which Dr. Jacoby reasonably

229   could have fit.

230         Furthermore, the Court notes that the New Jersey statute regarding

231   contributory/comparative negligence provides an established means of accounting for any

232   negligence or fault that might properly be attributable to Dr. Jacoby:

233         Contributory negligence shall not bar recovery in an action by any

36

234                person or his legal representative to recover damages for negligence
235                resulting in death or injury to person or property, if such negligence
236                was not greater than the negligence of the person against whom
237                recovery is sought or was not greater than the combined negligence
238                of the persons against whom recovery is sought. Any damages
239                sustained shall be diminished by the percentage sustained of
240                negligence attributable to the person recovering.

241

242  N.J.S.A. § 2A15-5.1.  In other words, if Plaintiffs demonstrate at trial that Dr. Jacoby's

243  negligence in not complying with FARs was equal to or less than the combined negligence, if

244  any, of S-TEC and the Government, then Plaintiffs can recover despite Dr. Jacoby's FARs

245  violations.  If, however, S-TEC prevails in convincing the jury that Dr. Jacoby's use of Fiorinal,

246  combined with his FARs violations, was greater than any combined negligence of S-TEC and the

247  Government, then Dr. Jacoby's estate can recover nothing.  *See Rodriquez*, 823 F.2d at 745 n.12.

248  In this regard, it would appear that S-TEC's entire argument on summary judgment is more

249  properly characterized as its argument for contributory negligence.  That is, S-TEC effectively

250  takes a series of factual contentions that might qualify as appropriate evidence of contributory

251  negligence on the part of Dr. Jacoby, and attempts to convert such contentions into an absolute

252  defense to liability dressed in the guise of public policy.

253          Accordingly, S-TEC's motion for summary judgment on the basis of violations of public

254  policy will be denied because genuine issues of material fact remain in dispute.  That is, disputes

255  remain regarding whether Dr. Jacoby was actually impaired or under the influence of butalibital,

256  and disputes remain as to whether his failure to disclose his medical history would have

257  prevented him from obtaining a license, much less whether such failure to disclose was the

258  proximate cause of the crash.  Indeed, with these issues still in dispute, it is unclear whether

259  public policy has been violated at all with respect to the FAR violations, especially to a degree

260    that would constitute a bar to all liability on the part of S-TEC.  Therefore, S-TEC's motion for

261    summary judgment will be denied.

262

263    **III.**    **Conclusion & Order**

264    For the foregoing reasons, it is hereby ORDERED that:

265    1.    Defendant S-TEC's motion *in limine* (Docket No. 302) to exclude the editorial

266    by Jon L. Jordan is DENIED.  The entire editorial of Dr. Jordan will be

267    admitted as impeachment evidence against Drs. Canfield and Veronneau.  The

268    Court will reserve judgment on the admissibility of the editorial as substantive

269    evidence against the Government until such time as the Government might

270    object.  Similarly, the Court will reserve judgment as to the admissibility of

271    Dr. Jordan's Affidavit of November 21, 2006 until Plaintiffs have had an

272    opportunity to articulate an objection, if any.

273    2.    Defendant Government's motion *in limine* (Docket No. 308) to exclude

274    documents produced by the NTSB is GRANTED IN PART and DENIED IN

275    PART.  Specifically, the Government's motion is GRANTED as to the 2001

276    Safety Recommendation, but is DENIED as to the Recorded Radar Study.

277    3.    Defendant S-TEC's motion *in limine* (Docket No. 304) to exclude the

278    Materials Laboratory Factual Report is DENIED.

279    4.    Defendant S-TEC's motion for leave to file supplemental information (Docket

280    No. 367) regarding the motion for summary judgment is GRANTED.

281    5.    Defendant S-TEC's motion for summary judgment (Docket No. 317) is

282         DENIED.

283         6.  Plaintiffs' motion for clarification (Docket No. 381) is GRANTED.

284             Specifically, inasmuch as Mr. Nixon will testify about and confirm certain

285             tests, and Mr. Edwards will confirm that he relied on them, the Court will

286             allow Mr. Edwards to testify from his perspective of an "expert pilot,

287             instructor, and accident investigator . . . how a pilot confronted with an

288             autopilot system that had failed would have responded, and as to how the

289             pattern of the accident corroborates or fits the expert opinion that the autopilot

290             system, specifically the turn coordinator and the Ready light, had failed."

291         7.  Plaintiffs' motion to file a sur-reply brief (Docket No. 352) is DENIED AS

292             MOOT.

293

294     Newark, New Jersey
295     Dated: September 18, 2007
296                         /s/ Harold A. Ackerman
297                         U.S.D.J.