NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | |
|---|---|
| ) | Hon. Harold A. Ackerman |
| IN RE: JACOBY AIRPLANE CRASH ) | |
| LITIGATION ) | Civ. No. 99-6073 (HAA) |
| ) | |
| ) | **FINDINGS OF FACT &** |
| ) | **CONCLUSIONS OF LAW** |
| _____ ) | |

**ACKERMAN, Senior District Judge:**

This action came before the Court for a trial by advisory jury pursuant to Federal Rule of

Civil Procedure 39(c). The jury rendered its advisory verdict in favor of Defendant the United

States of America. The following constitutes the Court's findings of fact and conclusions of law

pursuant to Federal Rule of Civil Procedure 52(a). For the following reasons, the Court finds in

favor of Defendant the United States of America (the "Government").

## I.    Background

This action was tried over the course of approximately eight weeks, starting on

September 25, 2007, and ending with an advisory verdict on November 19, 2007.[1] The trial

consisted of thirty-four live witnesses and several witnesses by deposition. This case arises out

---

[1] There were two defendants: S-TEC Corporation and the Government. S-TEC was
entitled to a trial by jury, but under the Federal Tort Claims Act, the Government could not be
subjected to a trial by jury. However, for purposes of clarity and efficiency, the Court sought an
advisory verdict from the jury. The jury rendered a binding verdict in favor of S-TEC and an
advisory verdict–that has no binding effect whatsoever–in favor of the Government.

of an airplane crash in Newark on November 26, 1999.  On that day, a small, private airplane

piloted by Dr. Itzhak Jacoby and owned by an entity known as Air Gem, Inc., a corporation that

was wholly-owned by Dr. Jacoby, departed from Linden, New Jersey airport en route to

Washington Dulles International Airport in Virginia.  On board the airplane were Dr. Jacoby,

who was the pilot, his wife, Gail Jacoby, and their thirteen-year-old daughter, Atira Jacoby.

Approximately five minutes after takeoff, the airplane crashed in Newark, New Jersey.  The

crash destroyed the airplane and killed all three people on board.  In the crash, a building owned

by Nimer Elsamna was damaged.  Plaintiffs are the estates of Itzhak, Gail, and Atira Jacoby, Air

Gem, Inc., Mr. Elsamna, and an entity owned by Mr. Elsamna known as Big Lion, Inc.

Plaintiffs claim that the crash occurred as a result of negligence on the part of the air

traffic controllers on duty at the time of the accident.  Plaintiffs also claim that they suffered

damages as a result of the crash.  The Government, which employed the air traffic controllers,

denies that it was negligent or that it caused the crash.  Instead, the Government asserts that the

accident was caused by the pilot and by the pilot's impairment from prescription drugs found in

his system.

II.     **Findings of Fact**

On November 24, 1999, Dr. Itzhak Jacoby flew his airplane, N8992M, from

Gaithersburg, Maryland to Linden, New Jersey.  (Final Pretrial Order Stipulations of Fact ("Stip.

Fact") at ¶ 86.)  His wife Gail and their thirteen-year-old daughter Atira were passengers on that

flight.  (*Id*. at ¶ 87.)  The purpose of the trip to New Jersey was to spend Thanksgiving with Dr.

and Mrs. Jacoby's daughter, Orit, and son-in-law, Edward F. Carroll, III, who lived in Brooklyn,

New York.  (*Id*. at ¶ 88.)

On November 26, 1999, Dr. Jacoby, Gail, and Atira, planned to fly in the Jacoby airplane from the Linden, New Jersey airport to Washington Dulles International Airport in Virginia; Dr. Jacoby was the pilot in command.  (Stip. Facts at ¶ 8.)  The New York Terminal Radar Approach Control ("TRACON") facility, located in Westbury, Long Island, provides air traffic control services to aircraft departing on Instrument Flight Rules ("IFR") plans from the Linden Airport and other airports in the area.  (*Id*. at ¶ 9.)  At 10:12 a.m., Dr. Jacoby received his IFR clearance, and at 10:46 a.m. he was released for takeoff.  (*Id*. at ¶ 11.)

Dr. Jacoby's airplane, N8992M, first appeared on radar at approximately 10:49 a.m. at an altitude of 300 feet.  (Stip. Facts at ¶ 125.)  During the entire flight, John Conklin was the only air traffic controller with whom Dr. Jacoby communicated after taking off from Linden, New Jersey.  (*Id*. at ¶ 164.)  At approximately 10:49:11 a.m., Dr. Jacoby checked-in on the radio frequency with New York TRACON and stated, "and ah departure eight niner two mike with you climbing five hundred for two thousand."  (*Id*. at ¶ 166.)  Six seconds later, Conklin stated, "eight nine nine two mike ah radar contact left turn ah heading zero one zero and climb and maintain five thousand."  (*Id*. at ¶ 167.)  Seven seconds after that, Dr. Jacoby replied, "zero one zero five thousand niner two mike thanks so much."  (*Id*. at ¶ 168.)  Seven seconds later, at 10:49:38, Conklin revised the instruction by stating "nine two mike amend the altitude maintain two thousand."  (*Id*. at ¶ 169.)  Four seconds later, Dr. Jacoby confirmed, "nine two mike two thousand at this time."  (*Id*. at ¶ 170.)  Up until this point, N8992M had been traveling in a generally northerly direction.  (*Id*. at ¶ 126.)

Twenty-three seconds later, at approximately 10:50:05 a.m., the plane began a turn to the

right that continued all the way until the aircraft was facing east-southeast on an approximate heading of 110 degrees.  (*Id*. at ¶ 127.)  Linden Airport is located a few miles southwest of Newark International Airport.  That day, Newark arrivals were flying in an approach from the south to north.  Thus, N8992M's orientation was perpendicular to, and heading towards, the flight path of aircraft landing at Newark, which created a danger that airplanes might collide.  (Tr. at Vol. 7, 8:14-25.)  Twenty seconds later, at 10:50:12, Conklin stated, "nine two mike turn left left turn heading two seven zero."  (Stip. Facts at ¶ 171.)  Six seconds later, with no response, Conklin again stated "nine two mike turn left heading two seven zero."  (*Id*. at ¶ 172.)  About eight seconds later, with still no response, Conklin stated "nine two mike new york."  (*Id*. at ¶ 173.)  Three seconds later, Conklin again stated "nine two mike new york."  (*Id*. at ¶ 174.)  Between 10:50:14 a.m. and 10:50:28 a.m., during the "big right turn," N8992M's altitude decreased from 1,100 feet to 800 feet.  (*See id.* at ¶ 128.)

Two seconds after the previous communication, Dr. Jacoby responded, at 10:50:31, "yes nine two mike I have a problem."  (*Id*. at ¶ 175.)  Six seconds later, Conklin inquired, "nine two mike what's your problem sir?"  (*Id*. at ¶ 176.)  Two seconds after that, Dr. Jacoby replied, "I had a gyro problem momentarily it looks straightening now I must [have] had water in the system."  (*Id*. at ¶ 177.)  By this time, N8992M's altitude had increased to 1,500 feet.  (Pls.' Demonstrative Ex. 3 (2D Animation).)

Eight seconds later, at 10:50:47, Conklin told the controller working the Local Control position at the Newark Air Traffic Control Tower, "local send U.S. Air around climb him to three that guys lost."  (Stip. Facts at ¶ 178.)  This is a reference to a commercial airplane that was traveling north and descending on approach to land at Newark International Airport.  Conklin's

4

directive is understood to mean that the commercial airplane was to climb to 3,000 feet and not descend as scheduled.  Six seconds later, Conklin reiterated, "you hear me climb U.S. Air to three and get him out of there."  (*Id*. at ¶ 179.)  Around this same time, air traffic controller Edward Garcia stopped all departures from Newark International Airport due to the evolving situation with N8992M.  (Tr. at Vol. 7, 90:2 to 91:13.)  In addition and in response to the developing situation with N8992M, air traffic controller Gary Saylors directed a Continental Airlines airplane and a Gulfstream airplane in such a manner that those aircrafts could not descend and land at Newark as planned.  (Tr. at Vol. 12, 11:2-24.)

Another six seconds later, Conklin stated, "nine two mike continue the right turn all the way around heading of uh correction you're in a left turn now."  (Stip. Facts at ¶ 180.)  Four seconds later, at 10:51:03, Dr. Jacoby stated, "yes sir niner two mike left turn climbing to niner thousand."  (*Id*. at ¶ 181.)  This was not a request to climb, but instead was a readback error, by Dr. Jacoby, to Conklin's command.  (Tr. at Vol. 7, 15:7-11.)  At this point, N8992M's altitude had increased to 1,800 feet.  (Pls.' Demonstrative Ex. 3 (2D Animation).)

Another four seconds after that, Conklin declared, "stop your climb at two thousand turn left left turn heading two seven zero."  (Stip. Facts at ¶ 182.)  Five seconds later, after no response from Dr. Jacoby, Conklin stated, "two seven zero nine two mike."  (*Id*. at ¶ 183.)  Sixteen seconds after that, with still no response, Conklin questioned, "nine two mike you're able you're okay to uh navigate now?"  (*Id*. at ¶ 184.)  N8992M's altitude had increased to 1,900 feet.  (Pls.' Demonstrative Ex. 3 (2D Animation).)

Four seconds later, at 10:51:31, Dr. Jacoby stated, "niner two mike I think I have a problem."  (Stip. Facts at ¶ 185.)  Eight seconds after that, Dr. Jacoby asked, "can you try to give

me a climb?"  (*Id*. at ¶ 186.)  This was the only request for a climb made by Dr. Jacoby.  (Tr. at Vol. 7, 15:7-11.)  When Dr. Jacoby made this request, he was already in a climb, having ascended to 2,100 feet from 1,900 feet approximately 8 seconds earlier.  (Pls.' Demonstrative Ex. 3 (2D Animation).)

Four seconds later, Conklin responded, "nine two mike maintain two thousand stop what is your heading?"  (Stip. Facts at ¶ 187.)  At 2,000 feet, N8892M was not in danger of colliding with any other aircraft, and was well above any ground structure in the area.  (Tr. at Vol. 7, 16:21 to 17:7.)  Furthermore, to the southwest of N8992M was a Lear jet flying northeast on approach to Teterboro airport.  (Tr. at Vol. 7, 44:21-24.)  The Lear jet was held at 3,000 feet to provide the 1,000-foot vertical separation between it and N8992M.  Ordinarily, by this point in an approach to Teterboro, the Lear jet would have been instructed to begin its descent, but it was held at 3,000 feet because of the presence, orientation, and action of N8992M.  (*See* Tr. at Vol. 8, 47:17-23.)  Conklin's plan was to turn N8992M underneath the Lear jet because that would be the quickest way to get N8992M into open space so that he could ascend to a higher altitude.  (Tr. at Vol. 7, 15:20 to 16:13.)

Five seconds later, Dr. Jacoby replied, "niner two mike uh looks like zero three zero."  (Stip. Facts at ¶ 188.)  N8992M had ascended to 2,200 feet by this transmission.  (Pls.' Demonstrative Ex. 3 (2D Animation).)  Four seconds after that, Conklin replied, "ok turn left left turn heading two seven zero."  (Stip. Facts at ¶ 189.)  Conklin's response of "ok" was a confirmation in his own mind–and to Dr. Jacoby–that whichever instrument Dr. Jacoby utilized to obtain his heading was operating correctly such that Dr. Jacoby could navigate by instrument.  (Tr. at Vol. 7, 18:10 to 19:1; 27:11-24; 94:7-13.)

By this point, N8992M had climbed to 2,300 feet.  (Pls.' Demonstrative Ex. 3 (2D Animation).)  While 1,000 feet of vertical separation between the Lear jet and N8992M would have been ideal, the air traffic controllers have approximately 300 feet of leeway such that airplanes that are only vertically apart by 700 feet pose no immediate problem, but should be watched.  (Tr. at Vol. 8, 49:8-20.)  After no response from his last command, at 10:51:58, Conklin stated, "nine two mike stop your climb at two thousand turn left heading two seven zero."  (Stip. Facts at ¶ 190.)  Eight seconds later, with still no response from Dr. Jacoby, Conklin stated, "nine two mike I need to be acknowledged please."  (*Id*. at ¶ 191.)  N8992M had climbed to 2,500 feet.  (Pls.' Demonstrative Ex. 3 (2D Animation).)  Three seconds later, Dr. Jacoby responded with his last transmission, "nine two mike I have a problem."  (Stip. Facts at ¶¶ 192, 193.)  By this transmission, N8992M had climbed to 2,700 feet.  (Pls.' Demonstrative Ex. 3 (2D Animation).)  Around this same time, an alarm sounded at New York TRACON, indicating that separation between the Lear jet and N8992M had been breached to a more serious degree. (Tr. at Vol. 8, 17:6-9.)  At that point, the air traffic controller Dominic Bocelli directed the Lear jet to turn to the west and climb to 4,000 feet to avoid a collision with N8992M, which had been steadily ascending in altitude.  (Tr. at Vol. 8, 17:10-14; 52:1-10.)  As an added incentive to motivate an expeditious response, Bocelli also informed the Lear that it had traffic–Dr. Jacoby–at "three o'clock" and at 2,700 feet and climbing.  (Tr. at Vol. 8, 52:1-10.)  The last radar return from N8992M indicated a top altitude of 2,800 feet.  After Dr. Jacoby's last transmission, Conklin unsuccessfully tried to contact N8992M ten separate times on the radio.  (Stip. Facts at ¶ 194.)  Within seconds of Dr. Jacoby's last transmission, N8992M began an uncontrolled descent that ended in the fatal crash in Newark.

In addition to the foregoing, there are a number of medical facts pertaining to Dr. Jacoby that should be discussed. Starting as early as 1972, Dr. Jacoby was continuously prescribed Fiorinal, a drug containing 50 mg of butalbital (a barbiturate), 325 mg of aspirin, and 40 mg of caffeine. (Stip. Facts at ¶ 16.) Butalbital is a barbiturate that, when used alone, depresses the central nervous system. Dr. Jacoby's primary treating physician prescribed Fiorinal to Dr. Jacoby for headaches. (*Id.* at ¶¶ 17, 18.) In 1994, Dr. Jacoby's primary care physician prescribed him 400 pills of Fiorinal. In 1995, Dr. Jacoby received 100 pills of Fiorinal. In 1996, he received 800 pills. In 1997, he received another 800 pills. In 1998, Dr. Jacoby received 1,000 pills of Fiorinal. In 1999, the year of the accident, Dr. Jacoby's physician prescribed him a total of at least 1,000 pills of Fiorinal in six separate prescriptions. After the accident, specimens of Dr. Jacoby's heart, kidney, lung, muscle, speen, and urine were sent to the Civil Aeromedical Institute Toxicology and Accident Research Laboratory for screening, which revealed 3.239 ug/g of butalbital in Dr. Jacoby's muscle tissue. (*Id.* at ¶¶ 133-34.)

To obtain an FAA medical certificate, a pilot must submit to an examination by a physician who has been designated as an aviation medical examiner. (*Id.* at ¶ 22.) Dr. James W. Allen was Dr. Jacoby's aviation medical examiner from October 1996 until Dr. Jacoby's death in 1999. (*Id.* at ¶ 23.) Dr. Jacoby saw Dr. Allen for annual aviation medical examinations in 1996, 1997, 1998, and on November 1, 1999, a few weeks before the accident. (*See id.* at ¶ 24.) At the commencement of each aviation medical examination, a pilot must complete FAA Form 8500-8, "Application for Airman Medical Certificate," and certify to the completeness and truthfulness of his responses on the Form. (*Id.* at ¶ 25.) Form 8500-8 asks the pilot to answer "yes" or "no" to whether he currently uses any prescription or nonprescription medications and, if so, to list those

medications.  (*Id*. at ¶ 26.)  The same form also asks the pilot to answer "yes" or "no" to whether he has ever had "frequent or severe headaches."  (*Id*. at ¶ 27.)

Every year from 1988 through 1999, Dr. Jacoby filled out this form and answered "no" to whether he suffered from frequent or severe headaches, and also answered "no" to whether he currently uses any prescription or nonprescription medications.  (*See id*. at ¶¶ 28-75.)  In addition, from 1996-1999, Dr. Jacoby failed to inform Dr. Allen that he suffered from tension and migraine headaches.  (*See id*. ¶¶ 55, 61, 67, 73.)  Dr. Jacoby also signed a certification each year from 1996-1999 stating that "all statements and answers provided by me on this application form are complete and true to the best of my knowledge, and I agree that they are to be considered as part of the basis for issuance of any FAA certificate to me."  (*See id*. ¶¶ 77-80.)  Dr. Allen issued Dr. Jacoby FAA medical certificates in 1996, 1997, 1998, and 1999 based, in part, on Dr. Jacoby's statements concerning his medical history and medication usage.  (*Id*. at ¶ 81.)  If Dr. Jacoby had reported his history of severe headaches or his Fiorinal use, Dr. Allen would have deferred issuing a medical certificate.  (*Id*. at ¶¶ 82-85.)

### III.   <u>Credibility of Witnesses</u>

As previously noted, this eight-week trial involved a parade of thirty-four live witnesses. It is incumbent on this Court to provide some explication of the credibility of some of the witnesses.

### A.   <u>Air Traffic Controllers</u>

With respect to the seven air traffic controllers that testified, the Court makes no adverse

credibility determination as to any of these controllers.  The Court notes that one air traffic

controller, Todd Davis, was excused from the stand during the Government's examination of

him, but because he was called as an adverse witness, Plaintiffs had ample opportunity to

develop his testimony, and nothing in his testimony or the nature of his departure from the

witness stand gave the Court any reason to question his credibility.[2]  Indeed, each controller, with

the exception of Steve Marotta, testified as a fact witness with no pecuniary advantage accruing

from such testimony.  They each answered the questions presented to them in a clear and direct

manner without any attempt at evasion or deception.  The Court found their testimony to be

honest, forthcoming, and highly credible.  The Court found the testimony of Conklin (the

controller communicating with Dr. Jacoby) and Bocelli (the controller communicating with the

Lear jet) to be especially credible.

        In addition, Steve Marotta, the air traffic controller supervisor on duty the day of the

Jacoby accident, testified for the Government as an expert in air traffic control.  He too was very

credible because his demeanor exhibited honesty and objectivity that proved persuasive to the

Court.  Specifically, Marotta explained the role that judgment plays in the world of air traffic

control, and he carefully analyzed the actions of each individual controller on duty that day.

Ultimately, Marotta concluded that each controller acted appropriately, none of them did

anything in violation of the air traffic control manual or any other standard governing air traffic

---

        [2] Sometime after the Jacoby accident, Davis, who had been working the Newark sector at New York TRACON, moved back to working the less demanding Islip sector.  Counsel for the Government attempted to elicit testimony regarding why he changed to the less demanding sector after the accident.  Contrary to Plaintiffs' counsel's suggestion at closing, the Court learned, subsequent to Davis leaving the stand, that he changed sectors for family reasons completely unrelated to the Jacoby accident.

control, and, critically important, none of the controllers could have done anything different to prevent this accident.  (*See* Tr. at Vol. 18, 141:13 to 147:7.)


    **B.**    <u>**Gary Shimon**</u>

With regard to Gary Shimon, Plaintiffs' expert on air traffic control procedures, the Court makes an adverse credibility determination as to most of Shimon's testimony.  Specifically, Shimon's testimony that the air traffic controllers did not "meet their responsibilities" was not believable, but instead sounded more like a carefully orchestrated exercise in advocacy, not analysis.  (Tr. at Vol. 8, 93:2 to 94:23.)  Indeed, at one point during direct examination, Shimon was giving his opinions as stated in his expert report and appeared to have forgotten what he was supposed to say next.  Plaintiffs' counsel suggested "what about the Lear jet?," which prompted Shimon to respond, "[t]he Lear jet obviously should have been pulled out [way] early."  (Tr. at Vol. 8, 132:20-23.)

The cold record does not show it, but Shimon's demeanor throughout his entire testimony left the Court with serious reservations about his analysis and ultimate opinions.  For example, Shimon testified on direct that the air traffic controllers failed to work as a team and that contributed to the crash of N8992M.  But, during cross-examination, the following colloquy occurred:

> Q.    You mentioned that the Lear jet was held at 3,000 [feet for]
>        longer than it would have been for that approach, right?
> A.    Yes.
> Q.    That was in response to the Jacoby aircraft?
> A.    Yes.
> Q.    Was that team work?
> A.    Is that team work?

Q.      Is that an example of team work?

A.      I don't think it is.

(Tr. at Vol. 8, 138:22 to 139:6.)  Shimon's answers in this exchange proved particularly

illuminating of his questionable credibility.  Indeed, it strains the Court's credulity to observe

Shimon malign the controllers for poor teamwork and then deny that action taken by one

controller in response to a problem aircraft being handled by another controller is not teamwork.

At another point, Shimon testified that when Dr. Jacoby said "climbing to niner

thousand," that meant that Dr. Jacoby did not mis-speak, but instead "wants to climb."  (Tr. at

Vol. 8, 120:23 to 121:12.)  As noted above, Conklin testified that he believed Dr. Jacoby's

statement to be a read-back error and that it was not in fact a request to climb above 2,000 feet.

The Court credits Conklin's testimony over Shimon's on this point.

Finally, as to the question of whether allowing N8992M to climb would have made a

difference in the outcome, Shimon was evasive.  At one point he said it was beyond his expertise,

but immediately thereafter he said that allowing the plane to climb definitely would have made a

difference.  (Tr. at Vol. 9, 21:4 to 25:7.)  The Government confronted Shimon with his

deposition testimony in which he was asked "'Do you have an opinion about whether or not this

plane would have crashed if the pilot was allowed to climb?'" and answered "'I don't know if he

would have crashed.  I don't think anybody knows.'"  (Tr. at Vol. 9, 25:1-5 (quoting deposition

testimony).)  When asked if that was still his testimony, Shimon answered in the affirmative.  In

sum, Shimon appeared to be one part expert, three parts advocate; a concoction that resulted in

highly questionable testimony on multiple crucial facts.

12

IV.     **Conclusions of Law**

Plaintiffs claim damages for personal injuries alleged to have been suffered as a result of the negligence of various air traffic controllers employed by the Federal Aviation Administration, an agency of Defendant the United States of America.  The Federal Tort Claims Act ("FTCA") provides a waiver of sovereign immunity by the federal government for certain torts committed by the Government such that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674; *see also Beneficial Consumer Discount Co. v. Poltonowicz*, 47 F.3d 91, 95-96 (3d Cir. 1995).  Pursuant to 28 U.S.C. § 1346(b)(1), this Court has exclusive jurisdiction involving "civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  The accident occurred in New Jersey and thus New Jersey negligence law applies to the Government's actions in this case.

To prevail on a negligence claim under New Jersey law, a plaintiff bears the burden of proving that "there was a duty on the part of the defendant towards the plaintiff, a breach of that duty, and evidence that the breach was the proximate cause of the injury to the Plaintiff."  *MCI Worldcom Network Servs., Inc. v. Glendale Excavation Corp.*, 224 F. Supp. 2d 875, 878 (D.N.J. 2002); *see also Weinberg v. Dinger*, 106 N.J. 469, 484 (1987).  Foreseeability of the risk of injury is a major consideration in determining the existence of a duty of reasonable care.

13

*Alloway v. Bradlees, Inc.*, 157 N.J. 221, 230 (1999).  The fact-specific analysis into whether a duty of reasonable care arises also "involves identifying, weighing, and balancing several factors – the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution."  *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 439 (1993).  Air traffic controllers owe a duty of care to pilots and passengers. *Redhead v. United States*, 686 F.2d 178, 182 (3d Cir. 1982).  "[N]egligence by the pilot does not, in and of itself, absolve the government of liability."  *Id.*  But the pilot "in command of the aircraft is directly responsible for its operation, and has final authority as to its operation."  *Id.*  In other words, air traffic controllers owe a duty of care to the pilots and their passengers, but the air traffic controllers cannot physically operate the plane, and thus their duty is limited to what reasonable actions could be taken to protect the aircraft and its occupants under the circumstances of their detached physical location.

Plaintiffs must also show causation, and "[i]t is axiomatic that 'the mere showing of an accident causing injuries is not sufficient from which to infer negligence.  Negligence is a fact which must be proved; it will not be presumed.'"  *Fedorczyk v. Carribean Cruise Lines, Ltd.*, 82 F.3d 69, 74 (3d Cir. 1996) (quoting *Hansen v. Eagle-Picher Lead Co.*, 8 N.J. 133, 139 (1951)).  To prove causation, plaintiff must show that "it was more likely than not that the negligent conduct of the defendant was a cause in fact of the injury," and that defendant's negligence was the proximate cause of plaintiff's injuries.  *Id.*  To show proximate cause, Plaintiffs must establish that defendant's negligence was a "substantial factor" in causing the injury.  *Brown v. United States Stove Co.*, 98 N.J. 155, 172 (1984).  "The proximate cause inquiry asks 'whether the [injury] was reasonably foreseeable or was, on the contrary, a remote or abnormal incident . .

14

. that was not otherwise reasonably foreseeable by defendant[ ].'" *Jakelsky v. Friehling*, 33 F. Supp. 2d 359, 365 (D.N.J. 1999) (quoting *Cowan v. Doering*, 111 N.J. 451, 465 (1988)); *see also Brown*, 98 N.J. at 172 ("If it can fairly be regarded as sufficiently remote or insignificant in relation to the eventual accident then, in a legal sense, such fault does not constitute a cause of the accident . . . [but] simply presents the condition under which the injury was received.") (citations and internal quotation omitted).

Plaintiffs specifically contend that the Government is negligent in this case because air traffic controllers took or failed to take a variety of actions with respect to N8992M.  First, Plaintiffs allege that the failure to directly provide Dr. Jacoby with adequate assistance was a breach of duty that proximately caused the accident.  Second, Plaintiffs contend that the controllers' failure to move the Lear jet, located to the southwest of N8992M, was a breach of duty and that such breach proximately caused the accident.

Within the first allegation, Plaintiffs point to three specific instances where the controllers, namely Conklin, failed to provide adequate assistance.  First, Conklin did not properly address Dr. Jacoby's comments that he had a "problem."  Second, Conklin did not provide a confirmation to Dr. Jacoby that he was on the heading announced, i.e., "zero three zero."  Third, Conklin did not permit N8992M to ascend to a higher altitude as requested by Dr. Jacoby.  The Court will address each issue seriatim, but it is important to note that Plaintiffs' arguments for negligence are somewhat interrelated.  For example, the fact that the controllers did not move the Lear jet cannot reasonably be construed to be a breach of duty standing alone, but instead must be analyzed in conjunction with the allegation that Conklin did not permit N8992M to ascend to a higher altitude *because* the presence of the Lear jet was a factor in that

15

decision.

With respect to providing adequate assistance, Plaintiffs' counsel, during closing arguments, focused the dispute by exculpating some, but not all, of the actions of the air traffic controllers. For example, Plaintiffs' counsel acknowledged that the first time Dr. Jacoby mentioned that he "had a problem," "Conklin responded appropriately" by asking "[w]hat is your problem, sir?" (Tr. at Vol. 25, 77:13-15.) "Mr. Garcia also made an appropriate response [when he told] Newark departures to stop the departures." (Tr. at Vol. 25, 78:2-4.) In addition, "Mr. Saylors made the appropriate response. . . . He was controlling two airplanes that were ten miles or more away. He stopped them. He spun them. He put them in a holding pattern." (Tr. at Vol. 25, 78:7-11.) Thus, the dispute between the parties over who committed negligence is narrowed to focus specifically on the controllers who handled the Lear jet to the southwest of N8992M, and Conklin with respect to some of his other communications–or lack thereof–with Dr. Jacoby.


A.      **"I have a problem"**

On three separate occasions during this short flight, Dr. Jacoby told Conklin that he was having "a problem." Again, Plaintiffs acknowledge that Conklin responded appropriately to Dr. Jacoby's first statement that he was having a problem. (Tr. at Vol. 25, 77:13-15.) The third, and final, time that Dr. Jacoby stated that he had a problem occurred at 10:52:09. (Stip. Facts at ¶ 192 ("nine two mike I have a problem").) As it turned out, that was also his final transmission before the crash. (Stip. Facts at ¶ 193.) At the point of that transmission, Dr. Jacoby was in a steady climb at 2,700 feet and the alarm had sounded at New York TRACON indicating that his plane and the Lear jet were in dangerous proximity. Immediately thereafter, the plane began a

16

steep descent and ultimately crashed.  Thus, it does not appear that Plaintiffs contend that

Conklin could have provided Dr. Jacoby with any particular assistance upon hearing his last

transmission of "I have a problem."  But even if Plaintiffs do contend such, the Court concludes

that Plaintiffs have failed to establish by a preponderance of the evidence that Conklin breached a

duty to respond to Dr. Jacoby's final transmission in a particular manner.  That leaves the second

"problem" transmission as the only other statement of "I have a problem" that Plaintiffs contend

qualifies as a failure to provide adequate assistance.

      The second time that Dr. Jacoby said he had a problem occurred at 10:51:31.  (Stip. Facts

at ¶ 185 ("niner two mike I think I have a problem").)  Immediately after this declaration, Dr.

Jacoby asked Conklin, "can you try to give me a climb?"  (Stip. Facts at ¶ 186.)  Conklin's

response to Dr. Jacoby's "problem" statement and request to go higher simply told Dr. Jacoby to

stop the climb that he was already in–having ascended to 2,100 feet–and maintain 2,000 feet as

previously directed, and then Conklin asked Dr. Jacoby for his heading.  Plaintiffs make much of

the fact that Conklin did not inquire as to Dr. Jacoby's specific problem, as Conklin had done the

first time, but instead just told Dr. Jacoby to maintain his altitude at 2,000 feet and then asked

about his heading.

      Given the dynamic nature of air traffic, it is difficult to conclude that Conklin's response

to Dr. Jacoby was inadequate to the degree that Plaintiffs postulate.  Instead, it is apparent to the

Court that Conklin noticed that Dr. Jacoby was ascending past his assigned altitude, and directed

him to maintain 2,000 feet at this point for multiple reasons.  First, there was other traffic in the

area that posed a danger to Dr. Jacoby if he were to climb at this point.  Second, if Dr. Jacoby

was having a problem, it was reasonable for Conklin to want to minimize the variables involved

17

prior to asking Dr. Jacoby to state his heading. Indeed, when Conklin asked for his heading, Dr. Jacoby responded "zero three zero," and that response confirmed for Conklin that Dr. Jacoby was able to navigate by instrument. Conklin's directive to Dr. Jacoby to maintain his altitude and Conklin's question regarding heading were both reasonable given the circumstances, especially in light of the fact that Dr. Jacoby had what appeared to be a navigation problem earlier in the flight when he almost flew into the Newark International Airport arrival traffic flow.

Furthermore, just before Dr. Jacoby's second statement that he was having a problem, Conklin asked Dr. Jacoby if he was able to navigate in light of the IFR conditions. When Dr. Jacoby did not respond that he was able to navigate, but instead said he had a problem, Conklin minimized the variables and figured out another way to get an answer to the critical question of whether Dr. Jacoby could navigate in the clouds. That is, Conklin asked Dr. Jacoby to identify his heading, which turned out to be correct.

Plaintiffs, however, also contend that Conklin's failure to affirmatively tell Dr. Jacoby that his heading was in fact 030 constituted another breach of duty by failing to give adequate assistance. As an initial matter, Plaintiffs are factually incorrect regarding whether Conklin confirmed to Dr. Jacoby that his heading instrument was providing accurate information. Contrary to Plaintiffs' characterization, Conklin's immediate response to Dr. Jacoby was "ok, turn left left turn heading two seven zero." (Stip. Fact at ¶ 189.) The "ok" was an affirmative response that confirmed to Dr. Jacoby that his instrument was working properly.

But even if the "ok" is not considered an affirmative response, Plaintiffs have not demonstrated that Conklin's lack of affirmative response was a breach of any duty. Indeed, Conklin was well aware of the aberrant nature of N8992M's flight and he knew that Dr. Jacoby

had stated that he was having a problem.  Accordingly, as Conklin testified, he asked for Dr.

Jacoby's heading so that Conklin could eliminate the possibility that Dr. Jacoby's undiagnosed

problem was a navigational one.  This was a critical question to ask because Dr. Jacoby was in

IFR conditions, which means that if he was unable to navigate, then Conklin's directions to Dr.

Jacoby to turn due west–directions Dr. Jacoby had failed to follow up to this point–would have

been counterproductive and possibly even harmful.  So Conklin asked the critical question and

learned that Dr. Jacoby was able to properly identify his heading, which meant that he was able

to navigate in the clouds.  There is little doubt that if Dr. Jacoby's pronouncement of "zero three

zero" had not been correct, then Conklin would have been under a duty to take appropriate action

to enable Dr. Jacoby to navigate, such as using a no-gyro vector.  But Plaintiffs have failed to

establish how it is a duty, much less a breach of a duty, for Conklin to fail to affirmatively

confirm for Dr. Jacoby's own peace of mind that his heading instrument was providing accurate

information.  On the contrary, Conklin and his fellow air traffic controllers were trying to control

the air traffic around Dr. Jacoby, i.e., they were trying to do their jobs.  That job involves

coordination with multiple aircraft that are constantly in motion.  Thus, it is beyond peradventure

that when Conklin learned that Dr. Jacoby was able to properly navigate his aircraft in instrument

conditions, Conklin was under no further duty to make an affirmative statement to Dr. Jacoby

that he was in fact on a 030 heading.

### B.  Altitude and Lear Jet

Plaintiffs also contend that Conklin did not provide Dr. Jacoby adequate assistance when

he asked to ascend to a higher altitude.  Of course, as noted previously, the issue of allowing Dr.

19

Jacoby to climb is interrelated with Plaintiffs' other allegation that the air traffic controllers should have moved the Lear jet. Accordingly, the Court will analyze the two allegations in tandem.

Conklin's first transmission to Dr. Jacoby directed him to ascend to 5,000 feet, but Conklin's second transmission, eleven seconds later at 10:49:38, amended that directive and told Dr. Jacoby to maintain 2,000 feet. After the first directive by Conklin to maintain 2,000 feet, Dr. Jacoby acknowledged the amendment by stating "nine two mike two thousand at this time." (Stip. Fact at ¶ 170.) Conklin never altered that 2,000-foot assignment throughout the remainder of the flight, and indeed repeated it on several occasions. As previously noted, Conklin assigned Dr. Jacoby to 2,000 feet because that is the lowest safe altitude available over Newark. In addition, the plan was for Dr. Jacoby to leave Linden, turn north, then due west so that he would pass under the Lear jet–that was to his southwest–that was traveling northeast to land at Teterboro airport. Again, the Lear jet was at 3,000 feet and needed to begin its descent to safely land at Teterboro, but it was held at that altitude to give Dr. Jacoby an opportunity to pass underneath with the standard safe 1,000-foot vertical separation. Thus, Conklin's initial assignment of Dr. Jacoby to 2,000 feet cannot be characterized as unreasonable.

But Plaintiffs contend that Dr. Jacoby requested to climb to 9,000 feet shortly after the big right turn of N8992M that placed it on an easterly heading and in danger of interfering with the arrival traffic flow at Newark International Airport. Specifically, after the exchange with Conklin regarding Dr. Jacoby's belief that he had "water in the system" that ostensibly caused the big right turn, Conklin directed Dr. Jacoby to turn all the way around. Dr. Jacoby responded, "yes sir niner two mike left turn climbing to niner thousand." (Stip. Fact at ¶ 181.) Plaintiffs

20

assert that this was a *request* by Dr. Jacoby to climb to an altitude above his assigned 2,000 feet. The Court already has found that Dr. Jacoby did not request to climb higher, but simply misunderstood Conklin's transmission. In other words, Dr. Jacoby committed a partial read-back error by correctly confirming that he was supposed to turn left, but incorrectly confirming that he was supposed to ascend to 9,000 feet elevation.

But even if Dr. Jacoby's read-back error reasonably could be construed as a request to climb to a higher elevation, there remains the question of whether it was reasonable for such a request to be denied. Indeed, at 10:51:39, thirty-six seconds after his read-back error, Dr. Jacoby did in fact request to climb to a higher altitude: "can you try to give me a climb?" (Stip. Fact at ¶ 186.) As previously discussed, this clear request occurred immediately after Dr. Jacoby's second transmission stating that he was having a problem. Again, the Court has already concluded that Conklin responded appropriately by telling Dr. Jacoby to maintain his altitude at 2,000 feet and ascertain his heading, which turned out to be northerly at 030. As such, the Court must answer the question of whether it was unreasonable for Conklin to deny Dr. Jacoby's request for a higher altitude, either at the time of the purported request to climb to 9,000 feet or the later unambiguous request to "give me a climb."

The answer to this question necessarily involves Plaintiffs' related allegation that the Lear jet to the southwest of N8992M should have been handled in some different manner so as to accommodate Dr. Jacoby and his family. Specifically, Plaintiffs assert that the Lear jet should have been directed to turn to the west or northwest and ascend to a higher altitude. If that had happened, there would have been no danger in allowing Dr. Jacoby to climb as requested. Thus, according to Plaintiffs, if Dr. Jacoby had been allowed to climb, he would not have crashed

21

because there is evidence that, at the time of impact, N8992M was approaching wings-level after its steep descent from 2,800 feet, which means that if it had more altitude before the steep descent began, it would have reached wings-level and ultimately completely recovered. Notably, Plaintiffs' theory contains multiple contingencies, which are not easily resolved in their favor.

In other words, for the Government to be liable here, Plaintiffs first must demonstrate that the read-back error regarding 9,000 feet was a request to climb because Plaintiffs' theory regarding the unambiguous request to "give me a climb" will not support a finding of liability on the Government's part. The reason the "give me a climb" request will not support a finding is because N8992M was already clearly ascending at the time of the request. That is, from 10:50:37, the time when Conklin asked Dr. Jacoby to identify his problem, to 10:51:39, the time when Dr. Jacoby said, "can you try to give me a climb?," N8992M ascended from 1,200 feet to 2,100 feet. In addition, N8992M continued to climb from 2,100 to 2,800 feet before the plane entered its steep descent and ultimately crashed. Thus, Plaintiffs' allegation that Conklin should have let him climb upon the unambiguous request cannot be a basis for liability because N8992M did in fact climb, regardless of permission.

Arguably, if N8992M had continued to climb without permission and then collided with the Lear jet, then the Government conceivably could be liable for not recognizing his ascent and not moving the Lear jet in time. Alternatively, if N8992M had stayed at 2,000 feet and began its descent from there and ultimately crashed because it ran out of room, then Plaintiffs might have a reasonable theory that the Lear should have been moved. But that is not what happened here. Accordingly, the only way the Government can be liable regarding the request to climb is if the read-back error was a request, because then, according to Plaintiffs, N8992M could have begun

to climb earlier in time and ostensibly would have reached a high enough altitude that once the steep descent began, he would be able to recover.

This Court has already determined that Dr. Jacoby's "niner thousand" statement was not a request to climb. But, again, even if the 9,000 feet statement was a request, Plaintiffs have other hurdles to overcome. For example, Plaintiffs have failed to explain how it could be that if N8992M had been given *permission* to begin its climb at 10:51:03 ("climbing to niner thousand"), it would not have entered into the steep descent at approximately the same altitude of 2,800. That is, credible evidence was adduced at trial demonstrating that the steep descent began because of an aerodynamic stall. Therefore, it is reasonable to conclude that the stall would have occurred at 2,800 feet due to too rapid an ascent regardless of whether Dr. Jacoby began that ascent earlier or later.[3]

Moreover, Plaintiffs have failed to address the critically important fact that N8992M was *in a climb* at the time he purportedly requested to climb to 9,000 feet. Indeed, after the recovery from the big right turn, there was one continuous climb from 1,200 feet at 10:50:37, to 1,500 feet a few seconds later, to 1,800 feet at 10:51:03 when he made the "niner thousand" statement, to 2,100 feet at 10:51:39 when he said "give me a climb," to 2,200 feet nine seconds later, to 2,300 feet ten seconds after that, to 2,500 feet eight seconds later, to 2,700 feet at his last transmission at 10:52:09 before continuing on to 2,800 feet and ultimately leaving controlled flight in steep

---

[3] The Court notes that Plaintiffs' alternative theory of liability against S-TEC alleged that the plane left controlled flight due to a mechanical malfunction. The jury rejected any liability on the part of S-TEC, but even if N8992M left controlled flight as Plaintiffs theorize, the Court's accompanying analysis would not change. That is, Plaintiffs have failed to demonstrate that the same mechanical malfunction would not have occurred at the same point in N8992M's continuous ascent even if Conklin had given Dr. Jacoby permission to begin the climb in which he was already engaged.

descent.  Thus, Plaintiffs have failed to demonstrate by a preponderance of the evidence that the mere *permission* to begin the climb that N8992M was already in would have prevented or contributed to the prevention of the ultimate crash.

Another hurdle Plaintiffs must overcome involves the point at which N8992M began its recovery from the steep descent.  There was credible evidence produced at trial that the recovery began at approximately the same point that N8992M emerged from the clouds such that Dr. Jacoby would have been able to see the ground, recover his orientation, and begin attempting to level out the plane.  Thus, Plaintiffs must explain why beginning the steep descent at a higher altitude would have resulted in a full recovery without crash, given the fact that the recovery likely would begin–even under Plaintiffs' theory of a higher altitude beginning point–at the same point of exiting the clouds and seeing the ground.  In other words, even if Dr. Jacoby had been given permission to climb–as he already was climbing–and even if the plane had not stalled or otherwise begun its steep descent at about 2,800 feet, what is there to demonstrate by a preponderance of the evidence that N8992M would have begun to pull out of the dive at a higher altitude, rather than upon exit of the clouds?  The answer is that Plaintiffs have failed to produce evidence demonstrating by a preponderance of the overall evidence on this point that beginning the uncontrolled descent at a higher altitude would have resulted in a recovery that *began* at a consequently higher altitude and that such higher altitude would have been enough for Dr. Jacoby to actually recover the plane before crashing into that or any other structure.

Coming full circle, Plaintiffs' primary allegation against the Government is that the air traffic controllers should have moved the Lear jet.  The Court is unpersuaded that the air traffic controllers handling the Lear jet should have directed it in any manner other than they did.

Indeed, when N8992M climbed well past its assigned altitude of 2,000 feet and the alarm sounded, the Lear jet was immediately directed to turn and ascend out of the area.  Prior to the breach in separation, the aberrant behavior of N8992M did not make it unreasonable for the controllers to keep the Lear on its heading for Teterboro.  Given the evolving situation with N8992M, the controllers took appropriate action by keeping the Lear at 3,000 feet despite the fact that it needed to begin its descent if it was going to have a safe landing at Teterboro airport.  As previously noted, Plaintiffs' theory that the controllers should have moved the Lear jet would be a sound theory if N8992M had collided with the Lear, but that did not happen here.

Furthermore, the controllers recognized the possibility that such a collision might occur when N8992M continued to climb, breached separation, the alarm sounded, and the controllers lost all radar contact with N8992M.  At that point, the controllers did not know that the plane had crashed, and operated on the assumption that it was still out there and climbing to a point that it would collide with the Lear jet.  Accordingly, the controllers directed the Lear to turn and ascend to avoid the last known trajectory of N8992M.  That action was taken to protect the Jacobys and the occupants of the Lear; and was an action in furtherance of the air traffic controllers' primary duty: to provide separation.  Indeed, separation is important because it is necessary for the pilots, who are the ones with their hands on the yoke, to be able to maneuver their aircraft without interference from other planes.  The controllers cannot fly the airplane, but instead can only provide a pilot with a reasonable amount of "elbow room" to operate safely given any unanticipated–e.g., mechanical–problem that might arise during flight.

Furthermore, even if the controllers breached their duty to Dr. Jacoby and his family by not moving the Lear out of the area so that N8992M could have all the air space it could use,

Plaintiffs have fallen woefully short of demonstrating proximate cause.  As explained above, even under Plaintiffs' theory of when Dr. Jacoby should have been given permission to climb, Plaintiffs have failed to demonstrate by a preponderance of the evidence that allowing him to climb upon his first purported request–assuming the Lear was out of his way–would have resulted in a different outcome.  For example, Plaintiffs have not even speculated that N8992M left controlled flight because Dr. Jacoby *saw the Lear jet* that had not been properly moved and therefore the mere presence of the Lear jet contributed to the cause of the accident.  In essence, Plaintiffs' allegation regarding the Lear jet depends on too many other factors that Plaintiffs have failed to establish.

In addition, even if those other factors were established, and even if the controllers' actions with regard to the Lear jet constituted a breach of a duty, the Court concludes that Plaintiffs have failed to demonstrate that it is more likely than not that such a breach was a cause in fact of the injury.  *See Fedorczyk*, 82 F.3d at 74.  Moreover, any conceivable breach by the controllers was not a substantial factor in causing the Plaintiffs' injuries because N8992M was already ascending–and continued to ascend–at the time of Dr. Jacoby's first purported request to climb.  *See Brown*, 98 N.J. at 172.  Thus, even if the Lear had been moved at the very moment Dr. Jacoby first announced that he had a problem, the flight path of N8992M would have been no different insofar as it would have ascended to the same point in space before leaving controlled flight and crashing to the ground.

The Court finds the testimony of Captain Barry Schiff, Defendants' piloting expert, to be the most compelling and persuasive:

Q.      Now, can you tell us, in your opinion, did air traffic control contribute in any way to this accident?

A.      Not in the least.  And I can, I think I can provide an analogy which will show you why they could not have done that.

Q.      What would be your analogy?

A.      Well, let's say that you are about to drive a car down a single-lane highway, down a steep winding mountain road. It is one lane.  And you don't know if there is another car coming up before you start off to go down.  So you have what is called a traffic controller at the top, and a traffic controller at the bottom.  The purpose of the traffic controller is simply to avoid or prevent two airplanes from colliding with one another.  That is what an air traffic controller does.  He separates traffic.

        So you are at the top of the road.  And the controller checks with the controller at the bottom and the one at the bottom says there is nobody coming up.  You are on your way down, go ahead.  Clear him down.  If the controller at the top tells you okay, you are clear to drive down.  Now, as you drive down this winding, dangerous road you have a problem. You have a steering problem, you have a breaking problem, you have some kind of a problem and you need help.  Calling a controller at the bottom of the mountain or at the top of the mountain is not going to do you much good.  You have a problem within your car.  You are going to have to resolve it. And the fate of what happens is in your hands.  That is the same thing that happened here.  Traffic controllers couldn't do anything to help this man if he couldn't control his airplane.

Q.      Plaintiff has provided the testimony of a couple of experts who gave the opinion that the air traffic controllers should have allowed Dr. Jacoby to climb.  Now, from a pilot's perspective, if a pilot is having a problem trying to diagnosis an instrument failure, is climbing helpful or not?

A.      No.  It is hurtful, actually.  The easiest thing that a pilot can do is fly straight and level.  That is the easiest chore that he has.  Any time you add to the complexity of a maneuver, and you introduce a climb, things happen in single engine airplanes.  May I have the model, please?

        . . . .

27

Q.      Whichever exhibit number it is, I am handing Captain Schiff the model of the V-tailed Bonanza.

A.      In straight, level flight, the airplane is easily balanced, easily controlled.  But as you add power and begin to climb, there is a phenomenon that occurs in single-engine airplanes, it is because of the effect of the propeller, that as you raise the nose and add power the airplane is going to want to yaw to the left.  That is a natural consequence of initiating a climb in a single-engine airplane and maintaining a climb.

So the airplane becomes more difficult to control in a climb than in straight and level flight.  So wanting to climb for that purpose makes no sense, if at a time, if at the time you are having difficulty controlling the airplane in the first place.  Besides, Mr. Jacoby, Dr. Jacoby, had the right and perhaps the obligation to climb any time he wanted to if that is what he saw fit to resolve his emergency.

Q.      And that is what has been referred to throughout the trial as the pilot's [emergency] authority?

A.      Correct.

Q.      Can you explain to the jury what that is?

. . . .

A.      This particular regulation says in lay terms, if you are having an emergency, if you are having a problem, you can deviate from any regulation, you can deviate from any air traffic control instruction.  You can do whatever you want to resolve the emergency that you are having.  And it is not held against you.  You don't even have to file a form when you are done.  Which is pretty unusual for the FAA.

(Tr. at Vol. 18, 57:22 to 60:25.)

In sum, Plaintiffs have failed to demonstrate by a preponderance of the evidence that the Government was negligent with regard to any facet related to the crash of N8992M. Accordingly, a verdict and judgment in favor of the Government is appropriate.

In addition to the foregoing, the Court notes that Dr. Jacoby had an extensive medical history demonstrating that he used the prescription medication Fiorinal, which contained the

barbiturate butalbital. Furthermore, as previously noted, Dr. Jacoby clearly had some butalbital in his tissue at the time of the accident. The parties hotly contested the issue of whether Dr. Jacoby was impaired at the time of the accident. The Court need not devote considerable analysis to this issue because the Court has already found that the Plaintiffs failed to meet their burden with regard to their allegations that the air traffic controllers were negligent.

Nevertheless, the Court found the testimony of Drs. Canfield and Veronneau to be credible and persuasive to the degree that even if the Government were negligent, the Court would hold that Dr. Jacoby's estate could not recover because his use of Fiorinal was a greater cause of the accident than any cause that could be attributed to the Defendants collectively. Indeed, Dr. Jacoby's persistent and consistent lies of omission and commission regarding his frequent and severe headaches and his use of Fiorinal were very significant insofar as he would not have received his airman's medical certificate without a deferred process, and likely would not have been allowed to fly at all. Accordingly, his estate should not be allowed to recover.

### *Conclusion & Order*

Following an advisory jury trial in this matter, and upon careful consideration of the record, and for the foregoing reasons set forth above, it is hereby ORDERED and ADJUDGED that Verdict and Judgment are entered in favor of Defendant the United States of America. The Clerk shall mark this case closed.

Newark, New Jersey
Dated: December 21, 2007

                                        /s/ Harold A. Ackerman
                                        U.S.D.J.

29